

JUDGE WOODS

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

METASWITCH NETWORKS LTD. and
METASWITCH NETWORKS CORP.,

                Plaintiffs,

    v.

RIBBON COMMUNICATIONS INC.;
GENBAND HOLDINGS COMPANY;
GENBAND US LLC; and SONUS
NETWORKS, INC. (d/b/a RIBBON
COMMUNICATIONS OPERATING
COMPANY),

                Defendants.

No. _____

The Honorable _____

# 18 CV 10815

**JURY TRIAL REQUESTED**

**REDACTED**

## COMPLAINT

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ....................................................................................3

II.   THE PARTIES.......................................................................................................11

      A.  Metaswitch ...............................................................................................11

      B.  Genband ....................................................................................................12

      C.  Sonus ........................................................................................................13

      D.  Ribbon ......................................................................................................13

III.  JURISDICTION AND VENUE ...........................................................................14

IV.   INDUSTRY AND PRODUCT BACKGROUND..................................................17

      A.  Fixed-Line Network Operators Historically Relied on Now Deteriorating
          Legacy TDM Circuit Switches ...............................................................17

      B.  Fixed-Line Network Operators Now Primarily Turn to Ribbon or
          Metaswitch to Modernize Their Fixed-Line Networks to Use VoIP
          Technology ...............................................................................................19

      C.  VoIP Fixed-Line Network Transformation Products and Services ........21

            i.    Softswitches.....................................................................................22

            ii.   Media Gateways ..............................................................................23

            iii.  VoIP Fixed-Line Network Transformation Services ................23

V.    RELEVANT MARKETS .....................................................................................23

      A.  The Fixed-Line Network Transformation Market ..................................24

            i.    The Fixed-Line Network Transformation Market Is a Distinct
                  Antitrust Product Market..............................................................24

            ii.   Ribbon Has Monopoly Power in the Fixed-Line Network
                  Transformation Market..................................................................26

      B.  The Legacy DMS Maintenance Market....................................................30

            i.    The Legacy DMS Maintenance Market Is a Distinct Antitrust
                  Product Market..............................................................................31

i

      ii.   Ribbon Has Monopoly Power in the Legacy DMS Maintenance Market .................................................................................31

   C.  Geographic Market ..........................................................................36

   D.  Interstate Commerce .......................................................................39

VI.    RIBBON HAS ADMITTED ITS SPECIFIC INTENT TO MONOPOLIZE BY ELIMINATING COMPETITORS THROUGH EXCLUSIONARY ACTS IN ORDER TO RAISE PRICES ..........................................................................39

VII.   RIBBON HAS ENGAGED IN UNLAWFUL EXCLUSIONARY CONDUCT TO ACQUIRE AND MAINTAIN MONOPOLY POWER ...................................41

   A.  Ribbon Has Engaged in Exclusionary Conduct by the Bad Faith Assertion of Patents That Nortel Deceitfully Incorporated into the CableLabs PacketCable Industry Standard While Seeking to Evade the Royalty-Free Licensing Obligation of that Standard. ...............................................41

      i.    Nortel, Ribbon, and Metaswitch All Participated in the PacketCable Standard-Setting Process Intended to Benefit Consumers by Lowering Production Costs Through a New Industry Standard With a Royalty-Free Patent Pool for IPR Included in That Standard. ......................................................41

      ii.   Nortel Tried—But Failed—To Shield Its Patents From the Royalty-Free Obligation by Deceptively Setting Up a "Paper" Shell Company. ......................................................................44

      iii.  Nortel Networks, Inc., Nortel Networks Cable Solutions, Inc., and Ribbon Failed to Withdraw Nortel's Patents from PacketCable Specifications, Resulting in a Perpetual, Royalty-Free License. ............46

      iv.  Nortel Manipulated the Standard-Setting Process by Deceiving CableLabs and Its Participants into Believing That Its Patents Would Be Made Available on a Royalty-Free Basis. ..............................48

      v.   Ribbon Deceived CableLabs and its Participants by Not Withdrawing the Patents from the PacketCable Standard, Which Independently Encumbered the Patents With a Perpetual Royalty-Free Licensing Obligation. ......................................................52

      vi.  Ribbon's Bad Faith Assertion of the Nortel Patents Against Metaswitch Was an Anticompetitive and Exclusionary Act....................53

      vii.  Ribbon Asserted Its IPR in Bad Faith to Block Metaswitch from Competing in the Legacy DMS Maintenance Market..............................55

        viii. Ribbon Asserted Inapplicable or NonExistent Intellectual Property Rights in Bad Faith Against Metaswitch's New Line Frame Adapters. ...................................................................62

            a. Ribbon kills Metaswitch's first attempt to commercialize the line frame adapters by asserting undisclosed intellectual property against line frame adapter products sight-unseen...........64

            b. Ribbon kills Metaswitch's second attempt to commercialize the line frame adapters in response to customer requests. .............68

    B. Ribbon Used Anticompetitive Acquisitions to Gain Monopoly Power in the Relevant Markets, Which It Then Leveraged to Maintain Its Monopolies Against Metaswitch Through Exclusionary Conditional Pricing Conduct ...........................................................69

        i. Genband's Anticompetitive Acquisitions ................................70

        ii. Sonus's Anticompetitive Acquisitions ....................................72

            a. The Genband-Sonus Merger Grants Monopoly Power to Ribbon. ................................................................73

            b. Ribbon Leveraged Its Acquired Monopoly Power in the Legacy DMS Maintenance Market in Order to Impede Metaswitch from Competing in the Fixed-Line Network Transformation Market. ................................................74

    C. Ribbon Also Engaged in Anticompetitive and Exclusionary Conduct to Acquire and Maintain Its Monopoly Power in the Relevant Markets by Repeatedly Making Materially False and Misleading Statements About Metaswitch and Its Products to Customers. ...........................................79

VIII. RIBBON'S EXCLUSIONARY CONDUCT HAS CAUSED SUBSTANTIAL HARM TO COMPETITION, CUSTOMERS, ULTIMATE CONSUMERS, AND METASWITCH ...................................................................82

    A. Anticompetitive Harm to Competition ................................82

    B. Anticompetitive Harm to Customers ...................................83

    C. Anticompetitive Harm to Consumer Subscribers ...............85

    D. Anticompetitive Harm and Damages to Metaswitch ...........86

CAUSES OF ACTION ...........................................................................................87

Count I:       Monopolization of the Fixed-Line Network Transformation Market,
               Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ..............................87

Count II:      Attempted Monopolization of the Fixed-Line Network Transformation
               Market, Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ................90

Count III:     Monopolization of the Legacy DMS Maintenance Market, Violation of
               Section 2 of the Sherman Act, 15 U.S.C. § 2....................................................93

Count IV:      Attempted Monopolization of the Legacy DMS Maintenance Market,
               Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ..............................95

Count V:       Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ..............................98

Count VI:      Patent Misuse, Violation of Section 2 of the Sherman Act,
               15 U.S.C. § 2....................................................................................................101

Count VII:     False Advertising, Violation of Section 43 of the Lanham Act,
               15 U.S.C. § 1125(a) .........................................................................................103

Count VIII:    Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, et seq. ..............104

Count IX:      Deceptive Acts, Violation of New York General Business Law § 349.........106

Count X:       Unfair Competition and False Advertising, Violation of Cal. Bus. &
               Prof. Code §§ 17200–17210 and 17500 .........................................................107

Count XI:      Declaratory Judgment, 28 U.S.C. § 2201 .......................................................109

PRAYER FOR RELIEF ......................................................................................................111

JURY TRIAL DEMANDED................................................................................................113

Plaintiffs Metaswitch Networks Ltd. and Metaswitch Networks Corp. (collectively, "Metaswitch" or "Plaintiffs") bring this action for damages, declaratory judgment, and permanent injunctive relief against Defendant GENBAND US LLC ("Genband"), GENBAND Holdings Company ("Genband Holdings"), Sonus Networks, Inc. ("Sonus"), and their newly combined entity, Ribbon Communications Inc., created from the merger of Genband Holdings, Sonus, and various holding companies, (collectively, "Ribbon"). The Complaint will use "Ribbon" for consistency when referring to Genband before the merger, but for clarity will separately identify "Sonus" when referring to Sonus before the merger.[1]

Plaintiffs allege as follows:

1.    Communities throughout the United States currently rely on decades-old, landline telephone networks that need modernization in order to ensure the continuity of reliable and cost-effective service to U.S. consumers.  In particular, Americans living outside of big cities where high-speed networks have not been and may never be built, and where cellular service can be spotty at best, still depend on traditional landlines to operate reliably for their daily use, as well as for critical emergency calls to police, fire departments, and 911.  These Americans receive their telephone service from more than 700 mostly small, local exchange telephone service providers.

2.    Local exchange carriers and others that operate these telephone networks ("network operators") serving these communities have been gradually modernizing their networks for decades, converting to newer technology that enables those networks to transmit both voice and data, in order to provide modern calling features such as voicemail, call waiting, and call forwarding.

---

[1] For simplicity, the Complaint will also refer to the merger between Genband Holdings, Sonus, and their various holding companies as a merger between Genband and Sonus.

3. Despite the increasingly pressing need to update aging infrastructure, Ribbon has eliminated most of the companies that previously competed to transform landline telephone networks to enable them to use modern voice over internet protocol ("VoIP") technology.

4. Defendant Ribbon has pursued a clearly articulated strategy to consolidate the industry through serial acquisitions and exclusionary conduct expressly intended to eliminate competition so that it can ultimately raise its prices to network operators. Ribbon takes pride in its acquisitions and has more than twelve acquisitions listed on its web page where it describes what Ribbon is "about." As a result, Ribbon is now the only company of any significant size left in the United States that provides maintenance services for the predominant type of legacy circuit switches used in landline networks that have not yet been modernized. Ribbon now also dominates the market for the transformation of landline networks from the use of these legacy switches to VoIP technology.

5. Plaintiff Metaswitch is Ribbon's only significant competitor remaining in the United States that also transforms these landline telephone networks to enable the use of VoIP technology. Although Ribbon has attempted to acquire Metaswitch as well, Metaswitch has refused. Determined to eliminate competition from Metaswitch by any means, Ribbon launched a multifaceted campaign to "kill Metaswitch," including filing five lawsuits in four years, abusing the standard-setting process, systematically maligning Metaswitch to customers with false and misleading information, engaging in predatory and exclusionary tactics, and using its monopoly in a legacy switch maintenance market to force network operators to acquiesce to using Ribbon for network transformation, even if they believed Metaswitch's products were more reliable, innovative, and cost effective.

6.     Left unchecked, Ribbon threatens to eliminate the only significant U.S. competitor left to provide a cost-effective alternative to Ribbon that is capable of modernizing over 58 million deteriorating U.S. landlines and legacy circuit switches that have not yet been updated so that future generations can have access to modern and more reliable VoIP technology.   Without Metaswitch, network operators will be increasingly unable to afford to modernize their fixed-line networks, which may result in service disruptions or even the inability to continue providing service to potentially stranded telephone service subscribers.   Indeed, Ribbon's conduct has already cost Metaswitch in excess of one hundred million dollars, which Metaswitch could have otherwise invested in bringing new, innovative products to the market for the benefit of network operators and end-user telephone service subscribers.   Ribbon's conduct is driving up—and will continue to drive up—costs for network operators throughout the United States and threatens to stand in the way of cost-effective, reliable fixed-line network upgrades that could significantly improve the day-to-day lives of many Americans, particularly those in rural areas.

## I. NATURE OF THE ACTION

7.     This is an action for damages, declaratory judgment, and permanent injunctive relief against Ribbon for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, the Lanham Act, 15 U.S.C. § 1125(a), and various statutory laws of New York and California.   By filing this action, Metaswitch is seeking to redress an egregious, sustained, and continuing campaign to monopolize the relevant markets and eliminate competition through exclusionary and anticompetitive behavior to provide (1) maintenance services relating to legacy DMS circuit switches used in fixed-line (i.e., landline) telephone networks, and (2) the products and services needed to modernize fixed-line voice networks to enable them to use VoIP technology.   Ribbon's monopolistic campaign to eliminate competition through exclusionary means has been successful. Ribbon has already excluded Metaswitch from the Legacy DMS Maintenance Market, and

3

Metaswitch alone remains as Ribbon's last-standing significant competitor in the Fixed-Line Network Transformation Market, each as defined below. *See infra* ¶¶ 94–174.

8.      Unlike Metaswitch, which has been creating innovative softswitch products used to migrate fixed-line telephone networks to VoIP since 2000, Ribbon did not focus on selling VoIP softswitches until much later.  Ribbon's focus changed in 2010, when Ribbon announced that it would "acquire substantially all assets of the Nortel Carrier VoIP and Application Solutions Business (CVAS)."

9.      Charles Vogt, CEO of Ribbon's predecessor, Genband, at the time, touted that, "[c]ombined with CVAS, [Ribbon] will have more than 200 million [Internet Protocol] switching ports deployed spanning 80 countries" and that "[a]s the world leader of next generation networking emerges, [Ribbon] customers will see a company that is the global market share leader in next generation networking solutions with an enviable installed base of marquee customers, including two-thirds of the top 100 service providers."

10.     Ribbon sought to consolidate the market and buy up legacy switch maintenance relationships with an aggressive series of anticompetitive acquisitions, including the 2011 acquisition of another VoIP switching provider, Cedar Point Communications Inc. ("Cedar Point"), right on the heels of the Nortel Networks, Inc. ("Nortel") CVAS acquisition.  At the time, Ribbon employees openly discussed that the only reason Ribbon was acquiring Cedar Point was to shut it down to eliminate the competition after buying its maintenance contracts, and that is what it did.  In addition to the Cedar Point and Nortel acquisitions, Ribbon acquired Syndeo Corp., BayPackets, Inc., the Digital Central Office circuit-switch business of Siemens Networks LLC, Tekelec's Switching Solutions Group, NextPoint Networks, Aztec Networks, Fring Ltd., and uReach Technologies.  Further, as a result of the 2017 Sonus merger, Ribbon additionally

4

encompasses Sonus's acquired entities, which include Telecom Technologies, Inc., Atreus Systems, Network Equipment Technologies, Inc., Performance Technologies Inc., and Taqua, LLC.

11.     Around the time of the Cedar Point acquisition, Mr. Vogt expressed his expectation that by buying up maintenance contracts covering the installed base of legacy DMS switches from Nortel and other legacy switch competitors, Ribbon would be able to convert legacy maintenance customers into customers of Ribbon's fixed-line network transformation products and services, which are needed to modernize fixed-line networks to use VoIP technology.

12.     But Ribbon had a problem.  Buying the legacy maintenance accounts alone was insufficient to prevent customers from choosing Metaswitch for their network transformation needs.  Indeed, having just quadrupled its size with the Nortel CVAS acquisition, Ribbon was in the midst of numerous rounds of lay-offs and reorganizations leading to disrupted relationships with customers.  Customers also reported that they preferred Metaswitch's VoIP technology because Ribbon's products had a variety of technical issues and were less stable and reliable.  They also preferred Metaswitch's customer service, as Ribbon's customer service had been nearly entirely outsourced overseas.

13.     Eventually, it was made clear to Ribbon employees that Mr. Vogt had had enough and was tired of losing to Metaswitch in a fair competition.  Accordingly, Mr. Vogt reportedly told Ribbon employees to do whatever it took to "kill Metaswitch."

14.     In response, Ribbon employees stepped up their efforts to "kill Metaswitch" by, among other things, using false representations for the purpose of spreading fear, uncertainty, and doubt, referred to by Ribbon as "FUD," to deceive customers that Metaswitch would not remain in the market long enough to support any products they installed for customers.  Ribbon executives

regularly circulated "FUD sheets" for their competitors that were based on false information, rather than legitimate market intelligence supported by third-party articles or data. Sales personnel were expected to—and did—spread this fear, uncertainty, and doubt with falsehoods about Metaswitch when meeting privately with customers considering competing bids.

15.     While virtually every last competitor bowed to the pressure to merge with Ribbon, Metaswitch continued competing vigorously by responding to customer requests to offer maintenance services relating to legacy DMS switches and to create new, innovative products known as "line frame adapters" to dramatically decrease costs associated with fixed-line network transformations by as much as tens of millions of dollars or even more depending on the transformation.

16.     Customers expressed the desire for Metaswitch to offer these new products and services in part because they feared they would be price-gouged as a result of Ribbon's coercive threats to keep maintenance prices at supracompetitive levels unless customers agreed to purchase network transformation products and services only from Ribbon—even if customers did not want Ribbon's VoIP products because of their technical problems. Indeed, Ribbon threatened to charge customers twice as much in costly maintenance fees if they chose Metaswitch over Ribbon for network transformations. These exclusionary acts were an anticompetitive leveraging of Ribbon's monopoly power in the Legacy DMS Maintenance Market to gain a competitive advantage against Metaswitch in the Fixed-Line Network Transformation Market.

17.     To protect its monopoly power in the Legacy DMS Maintenance Market and to further damage Metaswitch's ability to compete for network transformations through exclusionary conduct, Ribbon further responded to Metaswitch's attempt to offer legacy DMS maintenance

6

services and line frame adapters by threatening to sue both Metaswitch and the customers seeking these products and services for purported infringement of Ribbon's intellectual property.

18.     These litigation threats were objectively unreasonable and not made in good faith. Indeed, the maintenance services Metaswitch was offering were basic support services that anyone with the relevant know-how could have provided without interfering with software or using any proprietary information or intellectual property of Ribbon.  Metaswitch had partnered with a small company that had the know-how to provide these services but needed Metaswitch to provide the dependability of a larger company with established relationships and a track record of customer service that customers trusted.

19.     Moreover, Ribbon could not have threatened intellectual property litigation as to Metaswitch's line frame adapters in good faith, given that Ribbon never had access to a Metaswitch line frame adapter prototype by that time, such that it had no basis to assert any intellectual property infringement claim against such products.  Customers, however, were understandably fearful that they could get caught up in intellectual property litigation—no matter how frivolous—once Ribbon threatened it.

20.     In addition to the bad faith threats of intellectual property litigation against Metaswitch's maintenance services and line frame adapters, Ribbon filed a lawsuit in 2014 accusing different Metaswitch VoIP products it had long sold of infringing Ribbon patents, the majority of which Ribbon had acquired from Nortel.  Notably, at no time before filing suit had either Ribbon or Nortel suggested that these products infringed the asserted patents, demanded a royalty, or sought to negotiate a license.  Further, to Metaswitch's knowledge, neither Ribbon nor Nortel has ever asserted these patents in litigation against anyone else.

21.     Some of the asserted patents in the 2014 litigation were encumbered with a royalty-free licensing obligation as a result of their incorporation into the open CableLabs PacketCable Specification/standard, as well as with obligations to grant licenses on fair, reasonable, and non-discriminatory terms under other standards.  It was thus a further anticompetitive and exclusionary act for Ribbon to seek to use such patents against Metaswitch to protect its monopoly power without offering such a royalty-free license.  Indeed, CEO Charles Vogt publicly acknowledged Nortel's intellectual property was incorporated into an open standard at the time of the acquisition. Specifically, when Ribbon acquired Nortel's patents, Mr. Vogt stated, "By melding these market-leading technologies into [Ribbon], we will create the most comprehensive, standards-based switching portfolio in the world.  Our vision is to fuel the industry's desired network migration path to cutting-edge [Internet Protocol] technology by instituting open standards, open interfaces and interoperability."

22.     As reflected by Mr. Vogt's references to "standards-based switching," "open standards," and "open interfaces," Nortel's switching technology was incorporated into an open standard, the CableLabs PacketCable Specification, which required as a condition of participation that patents reading on the Specification either be withdrawn or subjected to a perpetual royalty-free license.

23.     It was later revealed during the patent infringement trial in 2016 that Nortel had tried to shield its patents from a royalty-free obligation by creating a "paper-only" shell company to manipulate the standard to its benefit without encumbering its patents.  CableLabs, however, required the shell company to obtain authorization to grant royalty-free licenses to any Nortel patents it contributed to the standard.  Moreover, neither the Nortel shell company nor Ribbon,

which also participated the CableLabs PacketCable project, withdrew the patents from the standard, resulting in a perpetual royalty-free obligation.

24.     While the 2016 patent infringement trial resulted in a damages verdict against Metaswitch, that case did not consider the fact that the bad faith assertion of the Nortel patents, which were subject to a royalty-free licensing obligation, was an exclusionary act in support of Ribbon's unlawful monopolization, as Ribbon successfully argued in a motion in limine that such evidence should not be part of that patent trial.

25.     Moreover, when the 2016 patent infringement trial did not result in an injunction against Metaswitch, and Metaswitch introduced new redesigned products to avoid any future claim of infringement, Ribbon once again acted in bad faith. Not only did it assert the royalty-free Nortel patents against the redesigned products, but it also filed a new infringement litigation without even inspecting the redesigned Metaswitch products to determine whether an infringement claim could be asserted. Indeed, Metaswitch had offered to provide the full source code for the redesigned products to Ribbon for inspection, so that Ribbon could determine that no infringement claim was warranted. Though Metaswitch's offer was on the table for over one year, Ribbon, acting in complete bad faith, refused Metaswitch's offer and went forward with its anticompetitive litigation intended to scare off Metaswitch customers for the redesigned products.

26.     Throughout this process, Ribbon continued to employ its exclusionary FUD strategy against Metaswitch—misrepresenting to customers that Ribbon would be able to obtain an injunction against Metaswitch and drive it out of business so that such customers would be fearful of relying upon Metaswitch for projects that would involve years of commitment. The anticompetitive and monopolistic intent behind Ribbon's exclusionary acts has been admitted by David Walsh, who replaced Charles Vogt as CEO of Ribbon's predecessor, Genband, leading up

9

to its merger with Sonus. In the course of trying to persuade Metaswitch to give up and be acquired by Ribbon, Mr. Walsh stated that: (1) Ribbon's goal was to eliminate competitors by either merging with them or "taking them out;" (2) Ribbon would never settle its patent cases for money because its goal was to eliminate the competition; (3) Ribbon intended to eliminate Metaswitch as a competitor so it needed to either merge or agree to exit the business in order to end the patent litigations; and (4) Ribbon ███████████████████████████████████████ ████████████████████████████████.

27.     Consistent with Ribbon's admitted and specific intent to monopolize the relevant markets, eliminate competitors, and charge supracompetitive prices, Ribbon has engaged in a sustained campaign of exclusionary and anticompetitive conduct to unlawfully acquire and maintain monopoly power in the Legacy DMS Maintenance Market and the Fixed-Line Network Transformation Market by substantially foreclosing, if not altogether eliminating, competition in these markets. Ribbon's conduct has not only caused grievous harm to Metaswitch, but also has caused substantial harm to competition, customers, and ultimate consumers ("subscribers").

28.     In sum, Ribbon's continuing campaign of anticompetitive and exclusionary conduct intended to acquire and maintain monopoly powers in the relevant markets, and to "kill Metaswitch," has included: (1) using serial acquisitions eliminating almost all competition in the Legacy DMS Maintenance Market and leveraging that monopoly power through pricing conditioned on not doing business with Metaswitch to gain a monopoly in the separate Fixed-Line Network Transformation Market; (2) using bad faith threats of intellectual property litigation to exclude Metaswitch from providing legacy DMS maintenance services; (3) coercing customers not to work with Metaswitch for network transformations by threatening to charge supracompetitive legacy DMS maintenance prices, where Ribbon has unlawfully acquired

monopoly power, if the customers do business with Metaswitch; (4) threatening baseless litigation against Metaswitch and Metaswitch's customers to prevent Metaswitch from producing new, innovative, and non-infringing line frame adapters capable of saving customers millions of dollars and enabling more customers to transform their networks; (5) concealing and perpetuating Nortel's deception of an industry standard-setting organization; (6) asserting and threatening to assert patents encumbered by a royalty-free licensing obligation, in bad faith, against Metaswitch and customers to restrain competition from Metaswitch; (7) suing Metaswitch in bad faith for patent infringement on redesigned products despite having rejected pre-filing inspection of those products and having no good faith basis to assert an infringement claim; (8) misusing its patents by asserting them both beyond the scope of their claimed subject matter and beyond their geographic scope; and (9) engaging in a sustained FUD campaign spreading materially false and misleading information to customers regarding Metaswitch's products and services and Metaswitch's continued ability to provide support for those products and services.  This conduct constitutes clear violations of Sections 1 and 2 of the Sherman Act, the Lanham Act, and various state statutes of California and New York as set forth in this Complaint.

## II. THE PARTIES

### A.     Metaswitch

29.     Plaintiff Metaswitch Networks Ltd. is a company organized under the laws of the United Kingdom.

30.     Plaintiff Metaswitch Networks Corp. is a corporation organized under the laws of Delaware.  Metaswitch Networks Corp. is a wholly owned U.S. subsidiary of Metaswitch Networks Ltd., with its principal place of business located in Los Altos, California.

31.     Metaswitch Networks Ltd. and Metaswitch Networks Corp. (collectively, "Metaswitch") are together one of the world's leading cloud native communications software

11

companies, constructively disrupting the way service providers build, scale, innovate, and account for communication services.  Metaswitch was founded in 1981 to develop high performance software for the communications industry.  For over thirty-five years, Metaswitch has invested substantial time and resources in developing innovative software solutions for the telecommunications industry.  Among other products and services, Metaswitch develops and sells software products to telephone service providers, which allow those companies to provide telephone services to businesses and consumers.  These products include softswitches, media gateways, application servers, and session border controllers that have helped operators migrate to Internet Protocol networks, which enable the delivery of a full range of voice services to customers.

**B.    Genband**

32.    Defendant GENBAND Holdings Company ("Genband Holdings") is a Cayman Islands exempted company limited by shares.  Genband Holdings maintains its principal place of business in Plano, Texas.

33.    Genband Holdings is a subsidiary of Ribbon Communications Inc.

34.    Defendant GENBAND US LLC ("Genband") is a limited liability corporation organized under the laws of Delaware.  Genband maintains its principal place of business in Plano, Texas.  Gendband's former CEO David Walsh maintained his primary offices in the Chrysler Building in New York, New York.

35.    Genband is the primary operating subsidiary of Genband Holdings and an indirectly-owned subsidiary of Ribbon Communications Inc.

36.    Genband was founded as "General Bandwidth" in 1999 and changed its name to "Genband" in 2006.

37.    Genband was a small telecommunications equipment manufacturer at the time of its founding in 1999 until at least 2004, when it still employed only about 80 people.  Since that

time, Genband has pursued an aggressive strategy of consolidating the VoIP industry, in which it operates to provide products, services, and solutions that convert voice and media content into digital signals capable of traveling over the internet.

## C.    Sonus

38.     Defendant Sonus Networks, Inc. ("Sonus") is a corporation organized under the laws of Delaware.  Sonus maintains its principal place of business in Westford, Massachusetts.

39.     Sonus is the sister company of Genband Holdings, and both companies are subsidiaries of Ribbon Communications Inc. Sonus does business across the United States as "Ribbon Communications Operating Company."

40.     Sonus provides communication solutions and products including session border controllers, softswitches, media gateways, and signaling equipment.

41.     Sonus has made a variety of acquisitions over the last five years that allowed it to broaden its market and product offerings, including the acquisitions of Network Equipment Technologies, Inc. in 2012; Performance Technologies, Inc. in 2014; Treq Labs, Inc. in 2015; and Taqua, LLC in 2016, among others.

42.     Historically, Sonus competed with Genband and Metaswitch as well as other networking and telecommunications equipment providers.

## D.    Ribbon

43.     Defendant Ribbon Communications Inc. ("Ribbon") is a corporation organized under the laws of Delaware.  Ribbon maintains its principal place of business in Westford, Massachusetts.  On information and belief, Ribbon CEO Franklin (Fritz) W. Hobbs and certain members of his executive team maintain their primary offices in New York, New York.

44.     In October 2017, Genband Holdings merged with Sonus in a transaction described as a "merger of equals."  Each company became a subsidiary of a parent company—Solstice

Sapphire Investments Inc., which later changed its name to Ribbon Communications Inc. ("Ribbon"). In conjunction with the merger, Sonus began conducting its business under the name Ribbon Communications Operating Company. Ribbon is publicly traded on the Nasdaq Global Select Market under the symbol "RBBN."

45.     Ribbon is a technology company that provides real-time communications related to Internet Protocol and cloud-based architectures to service providers and enterprises. Its products include "applications platforms and clients, call controllers, media gateways, session border controllers (SBCs), policy and routing, . . . [and] cloud communications 'as a Service' solutions."

46.     Ribbon continues to compete with Metaswitch in the "network transformation space."

### III. JURISDICTION AND VENUE

47.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, under Section 4 of the Clayton Act, 15 U.S.C. § 15, and under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), to compensate Plaintiffs for their damages. This Court has jurisdiction over the federal law claims alleged in this Complaint pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

48.     This Court has supplemental jurisdiction over the state law claims asserted in this Complaint under 28 U.S.C. § 1367 because the state and federal claims arise from a common nucleus of operative facts.

49.     This Court has personal jurisdiction over Ribbon, Genband Holdings, Genband, and Sonus pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

50.     This Court also has personal jurisdiction over Ribbon because Ribbon regularly does and solicits substantial business in New York, either directly or through intermediaries, is

continuously and systematically present in New York, and has established minimum contacts with New York. On information and belief, Ribbon CEO Franklin (Fritz) W. Hobbs directs Ribbon operations out of New York City. One Equity Partners, where Mr. Hobbs has served as an advisor since 2004, is also based in New York City. One Equity Partners is a private equity firm that helped fund Ribbon's predecessor Genband's acquisitions in order to consolidate the market.

51.     This Court also has personal jurisdiction over Genband Holdings and Genband because Genband regularly does and solicits substantial business in New York, either directly or through intermediaries, is continuously and systematically present in New York, and has established minimum contacts with New York, in particular by registering to do business in New York in 2012, maintaining a registered agent for service of process in New York, and centering its operations in New York City. Former Genband CEO David Walsh directed Genband operations out of New York City, as does current Ribbon CEO Franklin (Fritz) W. Hobbs, on information and belief. For over a decade, Mr. Walsh also served as Managing Director of One Equity Partners, where he worked in coordination with Genband, and Mr. Hobbs likewise worked in New York City at One Equity Partners for around ten years. Additionally, all or nearly all in-person merger discussions between executives of Genband and Sonus occurred in New York, including nine meetings in 2015 and several additional meetings in 2016 and 2017.

52.     This Court also has personal jurisdiction over Sonus because Sonus regularly does and solicits substantial business in New York, either directly or through intermediaries, is continuously and systematically present in New York, and has established minimum contacts with New York, in particular by registering to do business in New York in 2002 and maintaining a registered agent for service of process in New York. Additionally, all or nearly all in-person

merger discussions between executives of Genband and Sonus occurred in New York, including nine meetings in 2015 and several additional meetings in 2016 and 2017.

53.     In light of Defendants' substantial contacts with New York, this Court's exercise of personal jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.  Furthermore, Defendants' unlawful conduct alleged in this Complaint was directed at and had the intended effect of causing injury to Plaintiffs, companies with a presence in this judicial district.  The effects of the unlawful conduct alleged below were felt by Plaintiffs, as well as by customers and ultimate consumers, in this judicial district.

54.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)–(d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this judicial district, and Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this judicial district.  On information and belief, current Ribbon CEO Franklin (Fritz) W. Hobbs operates Ribbon from New York City.  Moreover, former Genband CEO David Walsh operated Genband from New York City, and private equity backer One Equity Partners is based in New York City.  Former Metaswitch CEO John Lazar met with David Walsh in New York City, where Mr. Walsh tried to acquire Metaswitch to consolidate the network transformation industry. Messrs. Vogt and Walsh conducted numerous other actions, including meetings with Metaswitch, in New York City, in which a significant part of the unlawful conduct at issue was carried out, overseen, and/or directed.

## IV. INDUSTRY AND PRODUCT BACKGROUND

**A.    Fixed-Line Network Operators Historically Relied on Now Deteriorating Legacy TDM Circuit Switches**

55.    In the 1970s, the copper "fixed-line" (i.e., landline) public switched telephone network ("PSTN") was revolutionized when Nortel developed digital switches, known as Digital Multiplex System or "DMS" switches.

56.    DMS switches delivered voice calls via copper wires through Time Division Multiplexing ("TDM").  TDM is a method of transmitting and receiving multiple simultaneous signals over a common connection, in which each signal occupies only a fraction of time in a repeating pattern and synchronized circuit switches at each end of the connection reconstruct each discrete signal.  This was the dominant method of enabling multiple concurrent voice calls over a single line in telecommunications infrastructure in the second half of the 20th Century.

57.    Circuit switches (or "switches") are a fundamental element of any telecommunications system.  When a call is made from any device, it is routed to a central location where it is connected through a switch or a series of switches to the recipient of the call.

58.    Switches communicate with each other to: (1) route calls to their proper destination (traditionally performed by "Class 4 switches"); and (2) provide end users with modern call functions such as a dial tone and ring (traditionally performed by "Class 5 switches").

59.    Nortel's DMS switches alleviated many reliability and voice quality problems that had previously been associated with earlier analog electronic switches.

60.     In May 2010, Ribbon acquired Nortel's Carrier VoIP and Application Solutions Business (CVAS), at which time Ribbon became the sole provider of DMS switches used by telecommunications carriers.[2]

61.     Despite exponential growth and significant technological advances in telecommunications since Nortel first released its DMS switches, DMS and other legacy switches, collectively known as "legacy TDM switches," remain prevalent in the telecommunications industry today.

62.     In 2016, Ribbon estimated that about 13,000 legacy TDM switches were still in operation, serving around 100 million telephone lines—roughly the same number of telephone lines as in the mid-1990s.

63.     Most legacy TDM switches, however, were engineered for replacement prior to their 20- to 25-year designed lifespan.  Accordingly, nearly all legacy TDM switches have been manufacturer-discontinued or are at their end of life, such that the age and wear on some of these switches is causing a multitude of product breakdowns, such as the fusing of switch backplane pins onto circuit boards, faceplate breakage, and the requirement for multiple recycling of repairs on critical controller boards.

64.     While component replacements may be possible, finding reliable components or replacement parts for legacy TDM switches is challenging and becoming increasingly so over time, which drives up the price for spare parts.

65.     In addition, skilled personnel with the know-how to operate legacy TDM switches, many of whom were trained in the 1980s, have left or are leaving the telephone business as they

---

[2] As set forth above, the entity created from the merger of Genband and Sonus has recently changed its name to Ribbon.  The Complaint will use "Ribbon" for consistency when referring to Genband before the merger, but will separately identify Sonus Networks, Inc. before the merger for clarity.

get older and as telephone operators phase out these positions, resulting in fewer and fewer technicians to maintain these highly complex legacy TDM switches.

66.     Original legacy TDM switch vendors are also increasingly unable to support legacy TDM switches for extended years, as the knowledge base among original switch vendors is likewise shrinking as fewer and fewer vendors know how to repair these complex and outdated systems.

67.     The increasing age of legacy TDM switches additionally increases the risk of switch failure, major service interruptions, and outages, which could result in the loss of voice service to geographic areas, government buildings, and businesses for hours or days at a time.

68.     Ribbon has accordingly warned that continued reliance on legacy TDM switches will lead "to an inevitable and possibly highly disruptive 'countdown to shut-down.'" Thus, "[w]hen it comes to traditional TDM-based central offices, doing nothing is simply no longer an option."

**B.     Fixed-Line Network Operators Now Primarily Turn to Ribbon or Metaswitch to Modernize Their Fixed-Line Networks to Use VoIP Technology**

69.     As rapidly aging fixed-line voice networks reach the end of their designed lifespan, fixed-line telecommunications network operators in the United States and Canada now primarily turn to either Ribbon or Metaswitch to modernize their local telecommunications networks by replacing DMS and other legacy TDM switches with VoIP packet-switched infrastructure.  In contrast, just five years ago, there were at least seven significant competitors selling softswitches to network operators for use with fixed-line network transformation services in the United States and Canada.

70. In the early 2000s, companies began modernizing traditional voice equipment, such as legacy Class 4 and Class 5 TDM switches, including DMS switches, to provide more cost-effective VoIP solutions.

71. VoIP technology rose to prominence in the 21st Century as a method of enabling voice communications over internet services and became a viable replacement for outdated TDM technology in telecommunications infrastructure.

72. VoIP technology transmits voice signals as digital information Internet Protocol "packets" via packet switches capable of traveling over the internet, rather than over the traditional copper wireline networks.

73. For approximately the past 20 years, these Internet Protocol network transformations have been the most significant source of business opportunities in the fixed-line voice industry.

74. The rise of VoIP was driven by the desire to intermix voice and data traffic over the same pathway, providing a lower cost of delivery. Replacing legacy TDM switches and changing from TDM and circuit-switched infrastructure to VoIP packet-switched infrastructure offered network operators and their customers many benefits, including lower costs, less space requirements, less use of energy, and more advanced applications and services.

75. Metaswitch and Ribbon compete to provide VoIP products, services, and solutions to help telecommunications carriers modernize their technology and infrastructure, while minimizing disruptions to users.

76. Metaswitch has been transitioning network operators to the more time- and cost-efficient VoIP infrastructures, as well as helping operators maintain compatibility with circuit-switched networks, since 2000.

77.     Although Ribbon started as just a media gateway vendor, Ribbon became the market share leader in carrier VoIP technology when it purchased Nortel's Carrier VoIP and Applications Solution Business (CVAS) in 2010, which quadrupled Ribbon's size in the market.

78.     At that time, Mehmet Balos, Executive Vice President and Chief Marketing Officer of Ribbon's predecessor, said that after the acquisition, the company then had 600 service provider customers of all sizes throughout the world, including two-thirds of the top 100.

79.     To enable fixed-line voice networks to use VoIP technology, Metaswitch and Ribbon provide VoIP software and hardware, including softswitches, media gateways, application servers, and sometimes session border controllers, as well as services required to implement the network transformation.

## C.     VoIP Fixed-Line Network Transformation Products and Services

80.     Two distinct types of products typically are required to transition from a TDM network to a VoIP network: softswitches and media gateways.   Network operators may additionally opt to install a session border controller, which increases the security of packet-switched networks and is sold by both Ribbon and Metaswitch, or a telephony application server, which provides calling features like call forwarding and voicemail.  Carriers may also opt to use line access gateways provided by Ribbon, which enable Ribbon to perform network transformations without having to remove legacy TDM switches.  Metaswitch developed a product known as a line frame adapter, which would allow a customer to modernize its fixed-line network without having to remove legacy TDM switches, copper lines, or line frames, but Ribbon interfered with the commercialization of that product, as discussed below. *See infra* ¶¶ 275–304.  Fixed-line network transformations further require the provision of consultation, design, configuration, and migration services required to implement the network transformation and install new VoIP products, as well as ongoing sales of customer care services (which include product upgrades) and

21

ongoing sales of new software licenses needed to cover new subscribers added by customers over time.

### i. Softswitches

81.    A software switch ("softswitch") is a device that uses software with switching logic (often termed a "call agent"), which controls call signaling and routing to coordinate the flow of information to and from media gateways that interact with both the public, fixed-line switched telephone networks and VoIP networks carrying internet data, voice, and video traffic.

82.    A softswitch is capable of controlling calls and processing media on a circuit-switched infrastructure, packet-switched infrastructure, or a combination of the two.

83.    Many network operators use a softswitch with both TDM and Internet Protocol capability as an essential transitional element, as they enable fixed-line networks to use VoIP technology.

84.    Class 5 switches traditionally connect to subscribers, providing basic services including dial-tone, calling features, and additional digital and data services to subscribers connected to a local loop.

85.    Class 4 switches traditionally do not provide subscriber lines; their role is to route calls between other switches.

86.    Modern softswitches are generally capable of performing both traditional Class 4 and Class 5 switch functions.

87.    Softswitches sold by Metaswitch include the Call Feature Server ("CFS"), which can run either standalone or co-located with Metaswitch's Universal Media Gateway ("UMG") as the VP6010 Integrated Softswitch.

88.    Ribbon's softswitch products include the C20, C15, and C3, and the T7000 (which Sonus acquired in its recent acquisition of Taqua).

### ii.     Media Gateways

89.     Media gateways provide seamless interoperability between different standards, such as fixed-line networks and mobile networks, so that phone calls work properly between networks using different technologies.

90.     A media gateway also enables a gradual transition from circuit-switched TDM infrastructure to packet-switched Internet Protocol infrastructure and thus is an essential component to enable fixed-line networks to use VoIP technology.

91.     Metaswitch's media gateway products include the MG6010 and MG6050 Universal Media Gateway products.

92.     Ribbon's media gateway products include the G2 (compact), G9 (converged), and G6 (multipurpose) media gateways.

### iii.     VoIP Fixed-Line Network Transformation Services

93.     In addition to the products discussed above, Metaswitch and Ribbon provide consultation, network design, configuration, and migration services that are necessary to execute the initial installation or "deployment" of new VoIP-based digital infrastructures in the place of legacy circuit-based equipment, as well as ongoing product upgrades and updates and customer support services following the initial installation.

## V. RELEVANT MARKETS

94.     Ribbon's anticompetitive conduct can be evaluated in at least two separate relevant markets: (1) the market to provide hardware and services required to transform fixed-line voice telephony networks from the use of legacy TDM switches to the use of VoIP softswitches and related technology (the "Fixed-Line Network Transformation Market"); and (2) the market to provide maintenance services for legacy DMS switches and related equipment (the "Legacy DMS Maintenance Market").

**A.      The Fixed-Line Network Transformation Market**

95.      The Fixed-Line Network Transformation Market encompasses the provision of the package of VoIP software and hardware, such as VoIP softswitches and media gateways, together with the related consultation, design, installation, migration, and support services required to enable fixed-line voice telephony networks to use VoIP technology. Fixed-line network operators that transition from TDM to VoIP need to transform their core voice network and typically need to preserve existing TDM connections and calling features (such as a ring and dial tone) while adding VoIP functionality so as not to disrupt subscribers. This process of modernizing the core voice networks from the use of legacy TDM switches to the use of VoIP softswitches is known as "fixed-line network transformation."

**i.      The Fixed-Line Network Transformation Market Is a Distinct Antitrust Product Market**

96.      Local exchange carriers are companies that provide telephone services to a local area, businesses, or other entities over landline (i.e., "fixed-line") wires carrying messages directed to recipients by a local central office switching system. Local exchange carriers, often referred to as "network operators," now turn predominantly to either Ribbon or Metaswitch to modernize their aging fixed-line networks to use VoIP technology because it offers unique characteristics that cannot be replicated using the traditional circuit switches based on now outdated TDM technology that has been in use since the 1970s.

97.      Unlike legacy TDM switches, VoIP enables local network operators to intermix voice and data traffic over the same pathway, providing a lower total cost of delivery. Replacing legacy TDM switches and changing from TDM and circuit-switched infrastructure to VoIP calls and packet-switched infrastructure offers network operators and their subscribers many unique benefits. For example: (1) packet-switched infrastructure and the accompanying connections can

be more cost effective, compact, and energy efficient than circuit-switched infrastructure; (2) network operators can offer more advanced applications and services over broadband connections; and (3) subscribers generally pay less for VoIP services than for traditional phone services.

98.    Fixed-line network operators seeking to modernize their fixed-line voice networks have no reasonable alternatives available outside of the Fixed-Line Network Transformation Market.

99.    As set forth in greater detail above, legacy DMS and other legacy TDM switches are not reasonable substitutes for VoIP softswitches and related technology, given the attrition of skilled employees able to operate legacy TDM switches, vendors who are no longer able to support them, a diminishing supply of spare parts, and the increasing risk of outages.

100.    As Ribbon has observed, fixed-line switches "serve mission-critical functions, for example, in military bases, hospitals, and first responder environments."  Reliable telephony is also "critical" for businesses, which can be among those most seriously affected by outages.

101.    Failing to transition from legacy DMS and other legacy TDM switches to VoIP technology, however, risks "catastrophic failure" and service interruptions that could last for many hours or days given "the advanced age of [TDM] switches."

102.    Accordingly, seeking indefinitely to extend the life of legacy TDM switches or "doing nothing is simply no longer an option," as Ribbon admits.

103.    Nor are other telephony technologies reasonable substitutes for fixed-line network operators that have already invested in their fixed-line network infrastructure.

104.    Wireless technologies, for example, operate using radio frequency, which can be blocked or interfered with in whole or in part by any number of obstructions, such as topographical depressions or elevations, geographic features, and buildings.

105.    Even where the wireless network coverage is strong, the features of a particular building can hinder reliability of service indoors.

106.    Wireless network coverage, moreover, is not consistent or reliable throughout the entirety of the United States or Canada, particularly in rural areas.

107.    The cost associated with implementing wireless networks also is prohibitive for network operators that have already invested in fixed-line networks.  Indeed, implementing a wireless network can cost as much as ten times the amount of modernizing a fixed-line network using VoIP technology.  Network operators seeking to implement wireless networks also require costly licenses to operate at certain frequencies.

108.    Accordingly, as Ribbon itself has observed, there is a "lack of acceptable mobile substitutes" for modernizing fixed-line networks to use VoIP technology.

109.    For all of the reasons above, fixed-line network transformation customers generally would not substitute away from VoIP technology in reaction to even a small but significant rise in prices because fixed-line network operators have no reasonable alternatives to fixed-line network transformation.

ii.    **Ribbon Has Monopoly Power in the Fixed-Line Network Transformation Market**

110.    Other than Metaswitch, Ribbon now has acquired every significant competitor that previously competed in the United States and Canada to perform fixed-line network transformations.

111.    Ribbon also has sought to acquire Metaswitch, but Metaswitch has rejected Ribbon's acquisition overtures.

112.    Although market data does not track the provision of fixed-line network transformations as a package, market data does track the integral components used in those transformations, namely Class 4 and Class 5 softswitches and media gateways, which provides an objective calculation of market shares in the Fixed-Line Network Transformation Market. It is appropriate to group Class 4 and Class 5 softswitches together given that they are now used interchangeably. Although session border controllers are also sometimes sold in connection with fixed-line network transformations, they are not an integral component, and sales of session border controllers are not a good indication of competitors' shares in the Fixed-Line Network Transformation Market because session border controllers are also frequently used in connection with other applications outside of the Fixed-Line Network Transformation Market.

113.    Market data tracking Class 4 and Class 5 softswitches, the main components used in fixed-line network transformations, indicates that the Fixed-Line Network Transformation Market is highly concentrated, with less than 5% of Class 4 and Class 5 softswitches sold by anyone other than either Ribbon or Metaswitch.

114.    Since at least 2016, even before its most recent acquisitions, Ribbon touted itself as "the global leader in fixed network transformation."

115.    Market data confirms Ribbon's dominant position in the Fixed-Line Network Transformation Market.

116.    Market data indicates that Ribbon's market share is steadily increasing at the expense of competitors and reflects that Ribbon has acquired a monopoly share of Class 4 and Class 5 softswitches, and thus the Fixed-Line Network Transformation Market.

117.    Specifically, recent market data indicates that Ribbon dominates the North American market, which includes the United States and Canada consistent with market tracking in this industry, with a market share of 73% of Class 4 and 5 softswitch sales.  Metaswitch, Ribbon's most successful and only viable competitor, comes in a distant second with a market share of only 23%.  Over the past year, Genband and Sonus together had an average market share of over 63% of Class 4 and 5 softswitch sales, but their merger in October 2017 has further insulated their market lead, as shown below in the chart of Class 4 and Class 5 Softswitch Sales in the United States and Canada.  Metaswitch had an average market share of Class 4 and Class 5 softswitch sales for the past year as a whole of 32%, which reflects the effective balance of the market given that Taqua, Metaswitch and Ribbon's last significant competitor, was eliminated from the market by Sonus's acquisition in 2016.



Class 4 and Class 5 Softswitch Sales in the United States and Canada          *Data Source: IHS Markit*

118.    Shares of Class 4 and Class 5 softswitch sales provide the best indication of shares more generally in the Fixed-Line Network Transformation Market because Class 4 and Class 5 softswitches are consistently used in connection with fixed-line network transformations.

119.    Market data additionally shows that Ribbon's market share of media gateway sales is at least 61%, as reflected below in the chart of Media Gateway Sales in the United States and

Canada.  Although such a market share is capable of supporting monopoly power in its own right, this share does not fully capture Ribbon's control over media gateway sales.  The company listed as having the second highest share of media gateway sales is Nokia, with 18%.  Ribbon, however, acquired Nokia's fixed-line media gateway product line in 2008 and entered into a long-term Original Equipment Manufacturer agreement with Nokia at that time.  Accordingly, on information and belief, Nokia no longer sells media gateways that are used in the Fixed-Line Network Transformation Market, and any media gateway products it currently sells are for use with wireless networks.  Metaswitch is the only other significant competitor selling media gateways, with a market share of 17%.



**Media Gateway Sales in the United States and Canada**                    *Data Source: IHS Markit*

120.    Ribbon has exercised its monopoly power by substantially foreclosing competitors from the market with the result that Ribbon is facing diminishing constraints on its ability to charge supracompetitive prices or otherwise harm competition, customers, and subscribers.

121.    Should Ribbon succeed in eliminating Metaswitch from the market as it has openly sought to do, it would exacerbate the inability of competitive forces to constrain Ribbon from charging supracompetitive prices, resulting in substantial harm to competition, network operators, and subscribers.

122.    Further, Ribbon's ability to raise prices above competitive levels for products and services needed to implement fixed-line network transformations is not reasonably constrained by any source of potential market entry or competitive alternatives to fixed-line network transformation.

123.    Barriers to entry are high and imposing for any potential entrant into the Fixed-Line Network Transformation Market, as exemplified by the fact that the market is highly concentrated.

124.    Successful entry into the Fixed-Line Network Transformation Market requires substantial technological know-how, research and design capabilities for complex high-tech products, and capital investment.

125.    Ribbon, moreover, holds a number of patents that it has asserted against competitors, including Metaswitch, relating to VoIP products used in fixed-line network transformations.

126.    Ribbon notes that legacy DMS switches are highly integrated into its customers' back office environments, and specialized tools and intellectual property from Ribbon are required to consolidate and migrate those environments to newer Internet Protocol-based services with optimal capital expenditure investments.

**B.    The Legacy DMS Maintenance Market**

127.    The Legacy DMS Maintenance Market encompasses maintenance services that are provided to fixed-line network operators with respect to legacy DMS switches and related equipment.

128.    The majority of legacy DMS maintenance services include troubleshooting a problem for fixed-line network operators and sourcing, reconfiguring, and fixing hardware.

129.    Legacy DMS maintenance services may also include software maintenance, such as fixing software bugs, performing software upgrades, and installing new features.

i.   **The Legacy DMS Maintenance Market Is a Distinct Antitrust Product Market**

130.   Legacy DMS switches have unique characteristics requiring specialized knowledge for proper maintenance. As Ribbon has admitted in court filings, the maintenance of legacy DMS switching equipment requires "significant technical expertise."

131.   Given the unique and specialized knowledge of Nortel's legacy DMS technology that is required to provide maintenance services on legacy DMS switching equipment, there are no reasonable alternatives to which network operators can turn for maintenance services specific to legacy DMS switching equipment.

132.   As Ribbon has recognized, customers have become increasingly concerned about legacy product maintenance because many older employees who have maintained this technology for a long time are aging out of the workforce.

133.   Improper maintenance by unskilled or unknowledgeable service providers could result in service outages or shut-downs affecting businesses, industries for which uninterrupted telephone service is critical, and entire geographic areas.

134.   For all of the reasons above, fixed-line network operators with legacy DMS switches in their networks generally would not substitute away from legacy DMS maintenance services in reaction to even a small but significant rise in prices because fixed-line network operators have no reasonable alternatives to legacy DMS maintenance services.

ii.   **Ribbon Has Monopoly Power in the Legacy DMS Maintenance Market**

135.   Ribbon admits that it became the "sole provider" of legacy DMS switches in May 2010.

136.   Ribbon, and Nortel before it, outsourced most of its maintenance services for legacy DMS switches to a single third-party repair vendor, Communications Test Design, Inc. ("CTDI") until 2011.

137.    Even before Ribbon acquired Nortel's DMS business, Nortel had outsourced all of its legacy DMS switch repair services to CTDI since 1999.

138.    In 2011, Ribbon chose to move its outsourced DMS customer repairs to a new repair vendor, Telmar Network Technology.

139.    CTDI sought to continue providing maintenance services for legacy DMS switches after Ribbon ended the outsourcing relationship in 2011, but Ribbon sued CTDI to prevent it from doing so.

140.    In its complaint, Ribbon pled that CTDI could not provide maintenance services relating to legacy DMS switching equipment without using Ribbon's trade secrets and proprietary information.

141.    Ribbon further pled that the Ribbon information required to provide maintenance services on legacy DMS switches was "highly confidential and proprietary technical information" that was "not available to other third-party repair companies."  "No third party, other than those with a need to know and with a confidential relationship with Nortel or [Ribbon], were given the information" needed to provide maintenance services on legacy DMS switching equipment. Indeed, "[e]ven within Nortel and [Ribbon], only those employees whose roles required them to have this information had access to it."

142.    Metaswitch has sought to enter the Legacy DMS Maintenance Market, but Ribbon retaliated by: (1) threatening intellectual property litigation should Metaswitch provide maintenance services for legacy DMS switches; and (2) suing Metaswitch for patent infringement.

143.    In its cease-and-desist letter to Metaswitch, Ribbon referred to its lawsuit against CTDI and threatened as follows: "[Ribbon] has additional intellectual property rights, including without limitation trade secret and other proprietary rights, relating to the performance of certain

32

support services for DMS switches. We believe that use of [Ribbon]'s intellectual property rights is required in order to properly and fully provide support services for DMS switches, such as for updating switches to a proper field baseline. Please be cautioned that [Ribbon] aggressively protects its intellectual property rights. Indeed, as you may be aware, [Ribbon] has recently filed a lawsuit against CTDI for violating [Ribbon]'s intellectual property rights in support services being provided by CTDI for switches . . . ."

144. Ribbon thus has taken the position that it has the power to exclude competitors from providing support services for legacy DMS switching equipment.

145. On information and belief, Ribbon now performs the vast majority of legacy DMS maintenance services by virtue of its control over legacy DMS switches.

146. Ribbon not only has monopoly power over legacy DMS maintenance services, but also has exercised that monopoly power by substantially foreclosing competitors, such as CTDI and Metaswitch, from the Legacy DMS Maintenance Market.

147. Providers of maintenance services for legacy TDM switches other than DMS switches or for VoIP softswitches do not reasonably constrain Ribbon from charging supracompetitive prices for its legacy DMS maintenance services, which are necessary for customers who have not yet upgraded their networks—or who are in the process of upgrading their networks—and thus still rely on legacy DMS switches.

148. Indeed, network operators whose networks require legacy DMS maintenance services requested that Metaswitch enter the Legacy DMS Maintenance Market in part because they believed that Genband was price gouging them.

149. Barriers to entry are high and imposing for any potential entrant into the Legacy DMS Maintenance Market.

150.    Ribbon's vast installed base of legacy DMS switches, the technical complexity of the switches, and Ribbon's objectively unreasonable and subjectively bad faith threats of intellectual property litigation create high barriers to entry for any company seeking to enter the Legacy DMS Maintenance Market.

151.    Successful entry into the Legacy DMS Maintenance Market requires substantial technological know-how, including specialized knowledge relating to Nortel's DMS technology, which is known to a decreasing number of individuals as experienced personnel retire or leave the business. Indeed, many skilled maintenance providers who were knowledgeable of Nortel's DMS technology were trained in the 1980s.

152.    Further, Ribbon holds a number of patents that it has asserted against competitors, including Metaswitch, that have sought to provide legacy DMS maintenance services, even though such patent assertion was unrelated to the provision of maintenance services. Ribbon also has asserted other unspecified intellectual property rights against Metaswitch and other competitors seeking to provide legacy DMS maintenance services, without specifying what these rights entail and regardless of the form of maintenance being offered.

153.    Indeed, as shown by Ribbon's lawsuits against CTDI as well as against Metaswitch, any company seeking to provide maintenance services on legacy DMS switches risks facing litigation from Ribbon. While Metaswitch is confident that it can compete for this business and perform nearly all generally required maintenance services without violating any Ribbon intellectual property, Ribbon's bad faith assertion of such infringement claims increases the barrier to entry for any potential competitors by imposing substantial litigation costs and scaring off customers for Metaswitch.

154. Further, as Ribbon states in its public filings, it has a large deployed base of Nortel DMS switches and media gateways in global service provider and enterprise networks, supporting over 30 million legacy-switched access lines.

155. Ribbon further states that these Nortel DMS switches are highly integrated into its customers' back office environments, require specialized tools, and implicate intellectual property owned by Ribbon.

156. Incumbent maintenance providers are difficult to replace because proper switch servicing requires vendors to have specialized knowledge and expertise, which is becoming more and more difficult to obtain as experienced individuals are aging out of the workforce.

157. The barrier to entry is even greater when dealing with a customer such as the United States Department of Defense ("DoD"), which provides substantial revenue to Ribbon and requires vendors to become Joint Interoperability Test Command ("JITC") certified. JITC tests technologies pertaining to multiple branches of the armed services to ensure that interoperability is built into the DoD communications network.

158. Ribbon's control over legacy DMS switches and relationships with network operators that require maintenance for legacy DMS switches creates a further substantial barrier to entry into the Legacy DMS Maintenance Market.

159. For all of the reasons above, despite the supracompetitive prices Ribbon charges for legacy DMS maintenance services, customers cannot reasonably substitute away to other service providers given the specialized knowledge required to service legacy DMS switching equipment and by virtue of Ribbon's substantial foreclosure of competitors from this market through anticompetitive and exclusionary means.

**C.      Geographic Market**

160.      The relevant geographic market encompasses the United States and Canada (hereinafter "North America").

161.      To compete effectively in North America, providers of fixed-line network transformations and legacy DMS maintenance services need distribution assets, relationships, and technology and know-how specific to fixed-line networks within this geographic area.  Providers of VoIP technology located outside of North America lack such assets and relationships within North America.

162.      North America requires voice technology unique to this market, which is not interchangeable with other regions of the world.  For example, the way automatic callback on busy service is implemented overseas is not the same as in North America, and European access networks are not compatible with those used in the United States.  As another example, the United States uses the Network Equipment-Building System ("NEBS"), the most common set of safety, spatial, and environmental design guidelines applied to telecommunications equipment in the United States.  NEBS is an industry (but not legal) requirement that is not followed in other geographic markets.

163.      Market analysts accordingly track sales of VoIP products for North America, comprising the United States and Canada in one region, while separately tracking Mexico with Central American and Latin American countries.

164.      Aside from needing technology and investments specific to North America, there are various historical and regulatory barriers that have prevented foreign competitors from having a significant presence in North America, and especially in the United States.

165.      For example, the Rural Utility Service ("RUS"), funded by the United States Department of Agriculture, provided term loans at reduced rates to allow fixed-line network

operators to make the substantial hardware investment in switching solutions, which generally ran around $1 million for smaller operators. The investment would typically last 15 to 30 years, and could be capitalized and depreciated over a long time. The U.S. government also subsidized land to host the equipment.

166.    A major requirement of the RUS program was a "made in America" clause. This clause required companies using RUS loans to purchase hardware exclusively from approved vendors who made their products in the United States, which excluded foreign competitors. In order to qualify for a RUS loan, a company had to be an incumbent local exchange carrier ("ILEC"). ILECs were companies designated by the U.S. Federal Communications Commission ("FCC") with the right to deliver telephony service in a certain geographic area.

167.    A "Buy American" provision was also included as part of the American Recovery and Reinvestment Act of 2009, President Barack Obama's stimulus package, which provided $7.2 billion toward improving broadband and wireless internet access, and imposed a general requirement that any public works project funded by the new stimulus must use goods manufactured in the United States. This provision likewise applies to network transformations that are performed by either Ribbon or Metaswitch to interconnect the fixed-line voice networks with broadband or wireless internet access lines funded by the stimulus.

168.    More recently, the FCC has also adopted the Connect America Fund ("CAF"), a comprehensive reform of its Universal Service Fund ("USF") and Intercarrier Compensation ("ICC") systems, to accelerate broadband build-out to the millions of Americans who lack access to infrastructure capable of providing high-speed internet. The first phase of funding took place in 2013, and between 2015 and 2018, a second phase of funding was awarded to network operators (including companies such as AT&T, Verizon, CenturyLink, Frontier, and Windstream) as part of

the initiative to bring broadband to rural areas. In the second phase, $1.5 billion of funding was awarded through a "reverse auction," meaning the lowest bid is the winning bid. To complete for this funding, providers must submit detailed bids, and are allowed to use whichever technology they like to build out the required infrastructure, but the technology must meet FCC standards. Because the FCC must approve the bid, providers do not use foreign vendors such as Huawei or ZTE, which are considered a security concern for technology such as the switches needed to convert wireline networks to VoIP.

169.    Additionally, U.S. fixed-line network operators have historically distrusted Chinese competitors that compete in foreign markets because they have been implicated over the years in incidents of spying on customers.

170.    U.S. network operators, especially those in rural areas, strongly distrust Huawei and ZTE. ZTE's standing in the United States was further damaged when it pled guilty in 2018 to violating U.S. export sanctions against Iran and North Korea. News articles from April 2018 also report that Huawei has been under criminal investigation in the United States since 2017 for the same type of violation. Huawei accordingly announced that it would shift its focus to areas of the world outside of the United States.

171.    Due to the shared technological standards between the United States and Canada, low-cost competitors such as Huawei and ZTE have also largely refrained from investing in the fixed-line voice market in Canada, as the high investment cost is not worthwhile based on market size when the United States is excluded.

172.    The absence of foreign competitors, such as Huawei and ZTE, contributes to make North America a unique and distinct relevant geographic market.

**D.   Interstate Commerce**

173.   Ribbon has marketed, promoted, and provided fixed-line network transformations and legacy DMS maintenance services throughout North America in a continuous and uninterrupted flow of hundreds of millions of dollars in interstate commerce, including through and into this judicial district.  Sonus also has marketed, promoted, and provided session border controllers for use in fixed-line network transformations throughout North America in a continuous and uninterrupted flow of millions of dollars in interstate commerce, including through and into this judicial district.

174.   Ribbon's business activities and those of its predecessors substantially affected interstate commerce in the United States and have caused antitrust injury throughout the United States.

## VI. RIBBON HAS ADMITTED ITS SPECIFIC INTENT TO MONOPOLIZE BY ELIMINATING COMPETITORS THROUGH EXCLUSIONARY ACTS IN ORDER TO RAISE PRICES

175.   Ribbon's specific intent to monopolize the relevant markets and to exercise its monopoly power by eliminating competitors and raising prices need not be inferred from circumstantial evidence.  There is direct and unequivocal evidence of Ribbon's intent—straight from the mouths of the CEOs directing Ribbon's exclusionary strategy.

176.   Sometime around 2011, Ribbon's former CEO, Charles Vogt, spoke openly to Ribbon employees about his desire to do whatever it took to "kill Metaswitch"—Ribbon's main competitor.

177.   This directive was carried on by Mr. Vogt's successor, David Walsh.  In October 2013, Mr. Walsh met with John Lazar, Metaswitch's former CEO, in New York City.  At that meeting, Mr. Walsh presented Mr. Lazar with a merger proposal.  In doing so, Mr. Walsh explicitly stated that his goal was to reduce the number of competitors either by merger and acquisition or

by other exclusionary means.  Specifically, Mr. Walsh stated that, in whatever business he was in, he has always focused on reducing the number of players in the market by either merging or "taking them out."  Metaswitch stood firm and ultimately rejected Ribbon's threats and merger proposal.  In January 2014, Ribbon sued Metaswitch for patent infringement, out of the blue, without any forewarning.

178.    In a second meeting in August 2014, Mr. Walsh again reiterated to Mr. Lazar that Ribbon's goal was to eliminate Metaswitch as a competitor.  He further added that Ribbon was not interested in settling the case for damages and that Ribbon was going to keep asserting its patents until Metaswitch was eliminated as a competitor.

179.    At another meeting between Mr. Walsh and Mr. Lazar, Mr. Walsh additionally told Mr. Lazar that Ribbon intended to put Metaswitch out of business and that Metaswitch exiting the market was the only option for a resolution of the patent infringement litigation.

180.    In September 2015, the new CEO of Metaswitch at the time, Martin Lund, reached out to Mr. Walsh to see if he would be willing to settle the patent litigation.  Mr. Walsh told Mr. Lund that Ribbon would settle for nothing but an injunction excluding Metaswitch from the market.  Mr. Walsh further stated that Ribbon would be open only to settlement proposals that precluded Metaswitch from competing with Ribbon in the marketplace and reiterated a number of times that Ribbon did not want to compete with Metaswitch.

181.    Most recently, in January 2017, Mr. Walsh told a group of Ribbon and Metaswitch personnel, including Mr. Lund and Mr. Tom Cronan, Metaswitch's CFO, that ██████████████

████████████████████████████████████████████████████████████████████

███████.

182.     Since the time Metaswitch turned down Ribbon's merger proposal in late 2013, Ribbon has engaged in a sustained and anticompetitive campaign of exclusionary conduct expressly designed to "kill Metaswitch" in order to acquire and maintain monopoly power in the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market, so that Ribbon could charge and maintain monopoly prices in those markets.

## VII. RIBBON HAS ENGAGED IN UNLAWFUL EXCLUSIONARY CONDUCT TO ACQUIRE AND MAINTAIN MONOPOLY POWER

A.     **Ribbon Has Engaged in Exclusionary Conduct by the Bad Faith Assertion of Patents That Nortel Deceitfully Incorporated into the CableLabs PacketCable Industry Standard While Seeking to Evade the Royalty-Free Licensing Obligation of that Standard.**

183.     One facet of Ribbon's campaign to eliminate Metaswitch from the Fixed-Line Network Transformation Market has been the bad faith assertion of intellectual property rights ("IPR") against Metaswitch and its customers that Nortel—whose patents Ribbon acquired—incorporated into an industry standard that requires royalty-free licensing while deceitfully seeking to avoid that licensing obligation.

i.     **Nortel, Ribbon, and Metaswitch All Participated in the PacketCable Standard-Setting Process Intended to Benefit Consumers by Lowering Production Costs Through a New Industry Standard With a Royalty-Free Patent Pool for IPR Included in That Standard.**

184.     In the telecommunications context, interoperability across manufacturers, product generations, and different technologies is necessary for consumers to communicate with one another regardless of the type of product or service they have. Due to this need for interoperability, network infrastructure vendors frequently collaborate to set various industry standards to ensure basic compatibility among telecommunications products and services.

185.     Metaswitch, Ribbon, and Nortel all participated in various standard-setting collaborations, including through a U.S.-based industry organization known as CableLabs.

186.    As CableLabs explains on its website, "Working in cooperation with cable companies and cable equipment manufacturers, CableLabs has developed sets of publicly available interface specifications to facilitate interoperability of cable devices, including . . . various telephony devices.  Interoperable devices based on common specifications facilitate consumer choice, widespread deployment of new technologies, and lower costs to both cable operators and consumers."

187.    In 1997, CableLabs launched a working group called the "PacketCable" project to create a specification "which will define interoperable interface requirements for products using Internet Protocol technology (the 'Specification') to deliver telephone calls, video-conferencing, and other packet voice and video services over cable networks that comply with the Specification (the 'PacketCable™' or 'PacketCable' project)."

188.    As CableLabs stated, "[t]he goal of the Specification is to (1) create an open interoperable interface to which any company can build products, without specifying any implementation of the interface of requirements of the products utilizing the interface and (2) encourage broad and uniform adoption of the Specification."

189.    CableLabs invited a number of companies to become PacketCable "Participants," meaning they would have the opportunity to participate in drafting one or more sections of the Specifications.  CableLabs required companies becoming Participants to sign several agreements with CableLabs, including the Contribution & License Agreement for Intellectual Property ("CableLabs Agreement").

190.    Metaswitch began participating in CableLabs in or around August 2000, initially as a signatory to a Confidential Information Access Agreement ("NDA Agreement"), which granted access to test plans once a Specification had already been drafted but not yet issued.  On September

5, 2002, Metaswitch Networks Corp. increased its involvement by signing the CableLabs Agreement to become a PacketCable Participant, under its prior official corporate name, "Data Connection Corp." Metaswitch Networks Ltd. also signed the CableLabs Agreement on January 3, 2007. As a PacketCable Participant, Metaswitch participated in CableLabs working groups, helped draft Specifications, attended interoperability events, and attended other conferences and meetings.

191.   Ribbon (at the time, Genband and Sonus) also participated in CableLabs. Sonus signed the CableLabs Agreement as Sonus Networks, Inc., and Genband signed the CableLabs Agreement as "General Bandwidth" on or around September 15, 2000.

192.   As was made public during a trial in 2016, Nortel Networks Cable Solutions, Inc. also executed the CableLabs Agreement in 2000, as well as two letter agreements with CableLabs in 2000 and another letter agreement with CableLabs in 2006.

193.   Joining PacketCable as a Participant has tremendous benefits to vendors such as Metaswitch, Ribbon, and Nortel. PacketCable Participants are allowed to participate in focus team communications, help draft CableLabs Specifications, and participate in working groups, which help author and refine CableLabs Specifications. PacketCable Participants also have access to working documents prior to other vendors that sign only an NDA Agreement, which later receive an "NDA draft specification."

194.   PacketCable Participants receive the benefit of the royalty-free patent pool, which is intended to permit Participants to create products complying with the CableLabs Specifications without the risk of being sued by other Participants for patent infringement.

195.   The CableLabs Agreement specifically obligates each PacketCable Participant to provide all other Participants with a "fully-paid, royalty-free . . . worldwide, perpetual license under its Licensed Claims" to any of its IPR that becomes part of a Specification.

196.   "Licensed Claims" under the CableLabs Agreement include not only the claims of all patents and patent applications to which the signatory Participant owns in its own right, but also those to which the signatory "has the right to grant licenses."

197.   As the testimony of Glenn Russell, who ran the PacketCable program, established during trial in 2016, companies wanting to be involved at the highest level of the PacketCable project agreed to the terms "that the technology that emerges that is being developed is all royalty-free," and that such a royalty-free pool was "important to the development of the PacketCable standard."

198.   Mr. Russell further testified that "the royalty-free patent pool [was] a way of sort of creating a level playing field where everybody disarms themselves of . . . IPR and knows that if they're contributing to . . . the specification, all the other 50 companies in the pool are on equal terms with them in terms of what they can contribute."

ii.   **Nortel Tried—But Failed—To Shield Its Patents From the Royalty-Free Obligation by Deceptively Setting Up a "Paper" Shell Company.**

199.   Nortel initially sought to shield its patents from being encumbered with a royalty-free obligation by creating Nortel Networks Cable Solutions, Inc. to participate in CableLabs in its place.  Nortel Networks Cable Solutions, Inc. was incorporated just five days prior to signing the CableLabs Agreement.

200.   As was made public during trial in 2016, Nortel Networks Cable Solutions, Inc. "was set up as a paper company" so that "if the paper company or shell company signed the

[CableLabs Agreement] where it pretty much required royalty-free participation in the specification development . . . the paper company . . . couldn't give away what they didn't own."

201.    Indeed, Nortel Networks Cable Solutions, Inc. had no operations separate from those of Nortel Networks, Inc.; it had no physical premises separate from those of Nortel Networks, Inc.; it had no patents or other intellectual property, no research and development, no technology, no assets, and no employees of its own; it had no regular board meetings, no employee meetings, and no operating budget; and it had none of its own products.

202.    In furtherance of its scheme to try to shield Nortel's patents from the royalty-free obligation, Nortel Networks Cable Solutions, Inc. asked CableLabs to agree in a February 29, 2000 side letter agreement to accept its participation in the PacketCable project with the understanding that Nortel Networks Cable Solutions, Inc. "owns no Intellectual Property other than those rights necessary to comply with the Agreement with regards to submissions to CableLabs by [Nortel Networks Cable Solutions, Inc.] employees."

203.    CableLabs, however, rejected the agreement as stated, adding the clarification that Nortel Networks Cable Solutions, Inc. therefore "will make no submissions to CableLabs that contain Nortel Networks Intellectual Property."

204.    Just two days later on March 2, 2000, Nortel Networks Cable Solutions, Inc. responded to the restriction prohibiting Nortel Networks Cable Solutions, Inc. from incorporating Nortel Networks, Inc.'s intellectual property into CableLabs standards.  Rather than agreeing not to incorporate Nortel Network, Inc.'s intellectual property in the PacketCable standard, Nortel Networks Cable Solutions, Inc. committed instead that, "[t]o the extent that a submission made by a[ ] [Nortel Networks Cable Solutions, Inc.] employee contains intellectual property owned by

45

Nortel Networks, Inc., [Nortel Networks Cable Solutions, Inc.] warrants that it will obtain the necessary rights from Nortel Networks, Inc. to comply with the terms of the Agreement."

205.    Enclosed with this commitment was the shell company's executed CableLabs Agreement, which obligated Nortel Networks Cable Solutions, Inc. to grant the standard "fully-paid, royalty-free . . . worldwide, perpetual license under its Licensed Claims"—that expressly included all patent claims for which Nortel Networks Cable Solutions, Inc. "*has the right to grant licenses*"—which the shell company had thus simultaneously warranted would include any submissions made by its employees containing any "*intellectual property owned by Nortel Networks, Inc.*"

206.    Accordingly, as a condition of its participation in the PacketCable project, Nortel Networks Cable Solutions, Inc. warranted that it would obtain the rights necessary to grant royalty-free licenses to any Nortel Networks, Inc. intellectual property that it contributed to any PacketCable Specification.

207.    On information and belief, Nortel Networks Cable Solutions, Inc. was responsible for assisting in the drafting of PacketCable Specifications in a manner that read on Nortel Networks, Inc.'s intellectual property.

208.    Indeed, the CableLabs Agreement would have prohibited any other Participant from doing so, in that the CableLabs Agreement signed by other Participants that were unaltered by side letters imposed a duty on Participants to not "knowingly contribute the IPR of another party" to a Specification.

iii.    **Nortel Networks, Inc., Nortel Networks Cable Solutions, Inc., and Ribbon Failed to Withdraw Nortel's Patents from PacketCable Specifications, Resulting in a Perpetual, Royalty-Free License.**

209.    While the CableLabs Agreement provides for a limited right to withdraw IPR from draft Specifications within 30 or 60 days from circulation depending on the Specification, doing

46

so terminates all licenses granted to the Participant under the CableLabs Agreement.  Under the CableLabs Agreement, notifying CableLabs of the desire to withdraw IPR from a Specification would also unequivocally result in CableLabs "exclud[ing] the specified IPR from the Specification."

210.   On the other hand, failure to timely notify CableLabs in writing of withdrawal results in the Participant "explicitly agree[ing] that such IPR shall be subject to the license grants from [the Participant] contained in [the CableLabs] Agreement."

211.   Participants were required to provide notice of withdrawal not only with respect to the initial Specification, but also with respect to revised Specifications, which have continued to be released through 2017, seven years after Ribbon purchased Nortel's patents.

212.   As a former Nortel Networks, Inc. employee testified at trial in 2016, neither Nortel Networks, Inc., nor Nortel Networks Cable Solutions, Inc., ever submitted written notices withdrawing the Nortel patents asserted by Ribbon against Metaswitch from the royalty-free PacketCable pool.

213.   On information or belief, Ribbon likewise has not withdrawn the Nortel patents asserted by Ribbon against Metaswitch from the royalty-free PacketCable pool, even though additional PacketCable Specifications have been circulated and released since Ribbon acquired Nortel's patents.

214.   Although Nortel Networks Cable Solutions, Inc. was the entity listed as participating in CableLabs, the shell company itself had no employees of its own such that the individuals who participated in CableLabs on behalf of Nortel were in fact employees of Nortel Networks, Inc.

215.    In order to prevent its patents from becoming encumbered with royalty-free licensing obligations, Nortel Networks, Inc. accordingly would have known it had to, or its shell company had to, withdraw its intellectual property from the Specification.   Indeed, Nortel Networks, Inc. had previously signed a PacketCable Confidential and Privileged Information Access Agreement in its own right with CableLabs to ensure it was privy to such information.

216.    As a result, PacketCable Participants expect that if they develop products that comply with or incorporate aspects of the various CableLabs Specifications or related documents, they will not be sued for patent infringement by other Participants.

iv.    **Nortel Manipulated the Standard-Setting Process by Deceiving CableLabs and Its Participants into Believing That Its Patents Would Be Made Available on a Royalty-Free Basis.**

217.    To the extent Nortel Networks Cable Solutions, Inc. did not obtain the rights necessary to grant royalty-free licenses to the Nortel Networks, Inc. patents contributed to the PacketCable standard, Nortel Networks Cable Solutions, Inc. deceived CableLabs and its Participants to try to unlawfully obtain monopoly power.

218.    Nortel Networks, Inc. and Nortel Networks Cable Solutions, Inc. further deceived the PacketCable project Participants by engaging in deceptive conduct that hid their intention of shielding Nortel Networks, Inc.'s patents from the royalty-free obligation or claiming a lack of authority to grant royalty-free licenses to Nortel's patents.

219.    Neither Nortel Networks, Inc. nor Nortel Networks Cable Solutions, Inc. indicated to the other Participants engaged in drafting the Specifications that the individuals working on the Specifications were not fully authorized to grant licenses to Nortel Networks, Inc.'s patents.

220.    Moreover, Nortel Networks, Inc. took affirmative steps to portray Nortel Networks Cable Solutions, Inc. to other Participants as the same entity that owned the patents.

221.    When participating in the PacketCable project and interacting with Metaswitch and other PacketCable Participants: (1) the Nortel employees were known to Metaswitch and the other CableLabs members as Nortel Networks, Inc. employees, and nothing about their conduct or actions suggested otherwise; (2) the Nortel employees used Nortel Networks, Inc. email addresses; (3) the Nortel employees introduced themselves as being with Nortel Networks, Inc.; (4) the Nortel employees presented materials to CableLabs members, and used products at events and demonstrations, that either used the Nortel Networks, Inc. logo or otherwise indicated they were Nortel Networks, Inc. products or materials; (5) the Nortel employees used Nortel Networks, Inc. business cards; (6) many PacketCable Specifications listed "Nortel" as a contributor in the acknowledgements section (with no mention of Nortel Networks Cable Solutions, Inc.), which Participants would review to ensure the information was accurate; and (7) CableLabs public relations touted Nortel's (not Nortel Networks Cable Solutions, Inc.) participation and commitment to contribute IPR on a royalty-free basis.

222.    In addition, these Nortel Networks, Inc. employees played a prominent role in the operation of CableLabs and the PacketCable project.  Nortel Networks, Inc. lent equipment to CableLabs and even provided a visiting engineer that maintained a permanent CableLabs presence to help draft the Specifications.

223.    As just one example of the specific interaction between Metaswitch and Nortel in the standard-setting process, between 2007 and 2008, Metaswitch and Nortel worked together to define the CableLabs Business SIP Services ("BSS") Feature Specification.  Sonus additionally worked on this Specification.  At least Mark Stewart from Metaswitch and Bill Gentry and Guy Vonderweidt from Nortel participated in weekly conference calls, daily email exchanges, and face-to-face meetings regarding the CableLabs BSS Feature Specification.  During this time, both

49

Metaswitch and Nortel worked closely together to develop the CableLabs BSS Feature Specification, and both companies wrote or edited portions of the BSS Feature Specification.

224.    During the mutual participation defining the CableLabs BSS Feature Specification, neither Mr. Gentry nor Mr. Vonderweidt ever suggested that they worked for an entity that did not have full authorization to bind Nortel Networks, Inc. with respect to their drafting and contributions to the Specification.

225.    Indeed, Mr. Vonderweidt's LinkedIn profile confirms that he held himself out as a "Nortel Networks" employee, rather than as an employee of Nortel Networks Cable Solutions, Inc. In his profile, Mr. Vonderweidt lists "Nortel Networks" as his employer without interruption from 1992 through 2010, when he became an employee of Ribbon's predecessor Genband, with no mention of Nortel Networks Cable Solutions, Inc.   While serving as a "Nortel Networks" employee, Mr. Vonderweidt represents that he was the "[o]n-site Nortel technical representative at CableLabs," who "[m]anaged all aspects of [the] Nortel relationship with CableLabs, including product certification, interop events, and contribution to protocol specifications and test suites," and "collaborat[ed] with design architects, market-facing teams and products managers to define the evolution of our products." Mr. Gentry's LinkedIn profile likewise represents that he worked for "Nortel Networks" for 20 years without interruption before becoming a Genband employee in 2010.

226.    Indeed, in at least one PacketCable Technical Report, CableLabs recognized Brian Lindsay from "Nortel Networks" for his "significant involvement and contributions to the [PacketCable] V02 Technical Report." CableLabs, moreover, required all individuals who worked on technical reports to be bound by the same CableLabs Agreement that Metaswitch had signed, which conditioned participation on an agreement to grant royalty-free licenses.

227. Accordingly, it was reasonable for Metaswitch and others to participate in the PacketCable project subject to the understanding that the Nortel entity participating in the project was likewise authorized by Nortel Networks, Inc. and bound by the same obligations as others— namely, to grant royalty-free licenses to patents covered by the Specifications and to review Specifications and timely withdraw any covered IPR that the entity holding the IPR did not want to be encumbered with a perpetual royalty-free obligation.

228. The affirmatively deceptive conduct of Nortel employees to give the appearance of participating in the PacketCable standard-setting process on behalf of Nortel Networks, Inc. enabled Nortel to ensure that PacketCable Specifications read on Nortel's patents while preventing Metaswitch and other Participants from objecting.

229. Had Metaswitch and other Participants been aware of Nortel's efforts to shield its patents from becoming encumbered with a royalty-free obligation, they would have been able to raise the issue with CableLabs and the other Participants and draft the Specifications in other ways. This is particularly true for Metaswitch, given that a Metaswitch employee served as the lead editor of a PacketCable Specification.

230. Even if Nortel's patents had been incorporated into the Specification, absent Nortel's deception, Metaswitch would have known to design its products around Nortel's patents without relying on the royalty-free patent pool.

231. Despite executing its fraudulent scheme, Nortel itself never sought to enforce any of its patents against other PacketCable Participants because, on information and belief, Nortel knew that its actions to avoid its licensing obligations were in bad faith, fraudulent, and unenforceable.

v.    **Ribbon Deceived CableLabs and its Participants by Not Withdrawing the Patents from the PacketCable Standard, Which Independently Encumbered the Patents With a Perpetual Royalty-Free Licensing Obligation.**

232.    Ribbon, which acquired Nortel's patents relevant to the PacketCable Specification (such as the IPR for legacy DMS switches) in 2010, subsequently asserted these patents against Metaswitch, in bad faith, even though the patents were encumbered with a royalty-free licensing obligation and had not been withdrawn by Ribbon from the Specification.

233.    Given Ribbon's participation in the PacketCable project, Ribbon would have known upon acquiring Nortel's patents that Nortel Networks, Inc. and Nortel Networks Cable Solutions, Inc. were either subject to the royalty-free obligation or had perpetrated a fraud against the PacketCable Participants.

234.    Ribbon also would have knowledge of Nortel's fraudulent scheme from the employees Ribbon acquired with Nortel's Carrier VoIP and Application Solutions Business. Indeed, nearly all of the key Nortel employees involved with CableLabs and drafting Specifications became Ribbon employees after the sale, and they had direct knowledge of, and participation in, Nortel's scheme.

235.    Despite this knowledge, Ribbon continued to deceive Metaswitch and other PacketCable Participants by: (1) failing to disclose Nortel's scheme; (2) failing to inform Participants that Ribbon would assert the Nortel patents against one or more Participants but would not provide royalty-free licenses; (3) not withdrawing Nortel's patents from the PacketCable standard; and (4) continuing to use Nortel Networks, Inc. equipment at CableLabs interoperability events, which perpetuated the false representation that Nortel Networks, Inc. had been the PacketCable Participant.

236.    At the time Ribbon acquired Nortel's patents, Ribbon's CEO made affirmative statements indicating that the Nortel patents had been incorporated into a royalty-free "open

standard." Specifically, CEO Charles Vogt stated with respect to the acquisition of Nortel's assets that "[b]y melding these market-leading technologies into [Ribbon], we will create the most comprehensive, *standards-based switching portfolio* in the world. Our vision is to fuel the industry's desired network migration path to cutting-edge Internet Protocol technology by instituting *open standards*, *open interfaces* and interoperability."

237. The affirmative acts described above taken by both Nortel and Ribbon fraudulently concealed their deceptive conduct for years. Metaswitch first learned that Nortel had created a shell company in an effort to shield its patents from a royalty-free licensing obligation in 2015, when this first became public during pre-trial proceedings in connection with Ribbon's first patent infringement case against Metaswitch.

### vi.   Ribbon's Bad Faith Assertion of the Nortel Patents Against Metaswitch Was an Anticompetitive and Exclusionary Act.

238. Ribbon's assertion of Nortel's patents, which were encumbered by the royalty-free licensing obligation under the CableLabs Agreement, against Metaswitch was an anticompetitive and exclusionary act.

239. Ribbon's assertion of Nortel's patents encumbered with the royalty-free licensing obligation under the CableLabs Agreement likewise violated its duty to "operate in good faith" owed under its CableLabs Agreement.

240. Ribbon's assertion of Nortel's patents against Metaswitch was precisely the anticompetitive result that the CableLabs Agreement's royalty-free licensing provision was designed to prevent.

241. Had Nortel or Ribbon withheld or withdrawn the Nortel patents from the PacketCable standard, the patents would not have been incorporated into the standard under the

terms of the CableLabs Agreement, and Ribbon would not be able to acquire or maintain its monopoly power by asserting such patents against Metaswitch and other competitors.

242.    Not long after Ribbon acquired the Nortel patents, Ribbon began asserting them in bad faith against Metaswitch—and Metaswitch's customers—in connection with any products and services relating even tangentially to legacy DMS switches. Ribbon asserted these patents in bad faith not only because they were encumbered with a royalty-free licensing obligation, but also because Ribbon asserted them recklessly and repeatedly against a broad spectrum of products and uses that could not plausibly be understood to infringe upon any of Ribbon's intellectual property.

243.    In addition to being encumbered with a royalty-free licensing obligation under the CableLabs Agreement, on information and belief, some of the patents Ribbon asserted against Metaswitch, including U.S. Patent No. 6,772,210, also were encumbered by obligations to grant licenses on fair, reasonable, and non-discriminatory terms as a result of reading on other standards, such as the Internet Engineering Task Force or "IETF" RFC 2543 standard and the International Telecommunications Union or "ITU"-T H323 standard.

244.    Wholly apart from the royalty-free license deception, Ribbon engaged in bad faith exclusionary acts by repeatedly threatening to sue, and in fact suing, Metaswitch for patent infringement relating to products sight-unseen and without any preceding request for royalties or license negotiations, as well as for support services that did not require the use of any intellectual property.

245.    The intent of these bad faith threats and litigations has not been to legitimately enforce intellectual property rights, but rather to use the threat of litigation as an anticompetitive weapon to scare customers into not choosing Metaswitch as a competitive alternative. Indeed,

Ribbon proclaimed that it was going to sue Metaswitch out of business such that customers could not rely upon Metaswitch to provide products and services in the relevant markets.

246.   Among other things, Ribbon repeatedly has employed the false and misleading scare tactic of telling customers that Ribbon was going to obtain a permanent injunction against Metaswitch to prevent Metaswitch from finishing network transformations and providing the requisite maintenance services for completed network transformations. Metaswitch had to conduct many calls with customers concerned about information they were hearing from Ribbon's sales teams. Not only were Ribbon employees falsely telling customers that Metaswitch would not be able to sell products or services in the future, but they were further telling customers that they would have to shut down the Metaswitch products in their networks as a result of the litigation. On information and belief, Ribbon itself did not have a subjective good faith belief that it would obtain the broad and sweeping injunction its employees told customers it would obtain.

247.   The repeated assertion that Ribbon would obtain a permanent injunction against Metaswitch in connection with the first litigation has already been proven false, but that has not prevented Ribbon from further false statements to potential and actual Metaswitch customers that the legal expense Metaswitch will incur and the large damages Ribbon would obtain in its subsequent litigations would drive Metaswitch into bankruptcy.

### vii.   Ribbon Asserted Its IPR in Bad Faith to Block Metaswitch from Competing in the Legacy DMS Maintenance Market.

248.   Metaswitch sought to enter the Legacy DMS Maintenance Market at the request of its customers. As a direct result of Ribbon's anticompetitive conduct, however, and despite customer demand, Metaswitch's ability to offer these services has been crippled.

249.   Network operators seeking to modernize their fixed-line networks require both network transformation and legacy DMS maintenance services. The network transformation

process often takes at least up to two years to complete and can even take ten years or more for large transformations. During that time, the network operator's legacy DMS switches continue to operate and require ongoing maintenance. Given these considerations, network operators commonly prefer to select a single vendor capable of performing the network transformation and also providing maintenance services for its legacy DMS switches during the network transformation process.

250.    Until late 2013, Ribbon was the only provider that offered both network transformation and legacy DMS maintenance services, providing it with a competitive advantage in both the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market.

251.    Metaswitch regularly heard complaints from network operators that they felt price-gouged by Ribbon yet felt they had no choice but to select Ribbon for their legacy DMS maintenance needs. Metaswitch also received requests from network operators to begin offering legacy DMS maintenance services to thereby provide network operators with an alternative to Ribbon.

252.    Responding to market demand, and to provide network operators with an alternative option to Ribbon's monopolistic and coercive pricing practices, Metaswitch began to develop a legacy DMS maintenance offering in 2013 by partnering with a third-party repair vendor, KCI Telecommunications, LLC ("KCI").

253.    Network operators turned to Metaswitch to provide these services in partnership with KCI, a much smaller company, because of the established relationships Metaswitch already had with customers, its proven customer service track record, and its size, which helped ensure

that network operators would be able to rely on the continual availability of maintenance services and the fast response times.

254.    Metaswitch and KCI could deliver the vast majority of legacy DMS maintenance services without the need for any intellectual property, trade secrets, or proprietary information from Ribbon because KCI employed ex-Nortel employees who independently had the requisite know-how to maintain legacy DMS switches.

255.    Metaswitch and KCI did not offer to provide software updates for legacy DMS switches that may have interfered with source code, but customers were content not receiving software updates because these switches were end-of-life products that had already been in place for many years and were just waiting to be replaced in any event.  Instead, customers wanted to use Metaswitch and KCI for basic troubleshooting to determine why something was not working correctly, to make configuration changes, and to source and replace hardware.  These are all things that a customer would be entitled to do with its purchased products on its own if it had the requisite technical know-how to do so.

256.    On November 20, 2013, Metaswitch issued a press release announcing its new maintenance services: "The service targets the DMS-10 and DMS-100 families of switches (originally manufactured by Nortel Networks and acquired by Ribbon) and the 5ESS Class 5 switches (made by Western Electric, which became part of Alcatel-Lucent)."

257.    Two days later, on November 22, 2013, Ribbon's Associate General Counsel sent a cease-and-desist letter to Metaswitch's Chief Legal Officer about Metaswitch's "recent announcement about its support service for legacy Class 5 switches." In its cease-and-desist letter, Ribbon (Genband at the time) claimed that the use of the registered "DMS" and "GENBAND" trademarks in Metaswitch's press release "g[ave] rise to a likelihood of confusion and potential

misimpression that Metaswitch is an authorized service representative of GENBAND or otherwise endorsed by or affiliated with GENBAND." In addition to demanding that Metaswitch "cease and desist" using the DMS and GENBAND trademarks, Ribbon also demanded that Metaswitch take "remedial actions" to "promptly issue a corrective/clarifying press release announcement (that is first reviewed and approved by GENBAND)." Ribbon threatened to "pursue all legal remedies available" if Metaswitch failed to respond to Ribbon's demand.

258.   Ribbon's cease-and-desist letter further warned that Ribbon had "additional intellectual property rights, including without limitation trade secret and other proprietary rights, relating to the performance of certain support services for DMS switches." The letter suggested that Metaswitch had violated Ribbon's intellectual property rights by providing maintenance services for legacy DMS switches because, in Ribbon's view, "use of [Ribbon]'s intellectual property rights is required in order to properly and fully provide support services for DMS switches." Ribbon then threatened to pursue legal action against Metaswitch by "caution[ing]" Metaswitch that Ribbon "aggressively protects its intellectual property rights." As an example, Ribbon pointed to its recent lawsuit against CTDI for allegedly violating Ribbon's intellectual property rights by continuing to provide maintenance services for legacy DMS switches after Ribbon ended its outsourcing relationship with CTDI.

259.   Although Metaswitch did not believe it was required to do so, Metaswitch promptly reissued the press release making the alterations demanded by Ribbon.

260.   Nonetheless, Ribbon was not satisfied with Metaswitch's reissuance of the press release, which made the alterations Ribbon had requested.

261.   Less than two months later, on January 20, 2014, Ribbon initiated a patent infringement action against Metaswitch in federal district court, asserting eight patents. *See*

Complaint, *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-33-JRG (E.D. Tex. Jan. 21, 2014).

262.    Despite the written threat of legal action specific to Metaswitch's proposed legacy DMS maintenance services, this litigation did not specifically attack maintenance services themselves. Instead, the accused products were those Metaswitch had been providing for years without any indication or suggestion of infringement up until that date by either Ribbon or Nortel.

263.    Although Ribbon's infringement claim concerned Metaswitch products that were unrelated to its legacy DMS maintenance service offering, Ribbon's former CEO, Mr. David Walsh, told Metaswitch's former CEO, John Lazar, that Ribbon filed the litigation in response to Metaswitch offering legacy DMS maintenance services—i.e., not for a legitimate purpose related to the products in suit.

264.    Ribbon ensured that the threat was clearly articulated with respect to Metaswitch's proposed encroachment on Ribbon's legacy DMS maintenance monopoly: If Metaswitch or its customers continued to pursue legacy DMS maintenance services provided by Metaswitch and/or KCI, there would be further litigation—a threat made credible no matter the lack of merit by Ribbon's assertion of patents encumbered with a royalty-free licensing obligation.

265.    The litigation also was accompanied by threats to customers that if they proceeded to use Metaswitch for legacy DMS maintenance services, they too could expect to be sued. Yet, Ribbon had not specified any part, product, or method relating to the legacy DMS maintenance services Metaswitch was offering that is covered by any intellectual property, much less the patents that it has asserted in retaliation for attempting to enter the Legacy DMS Maintenance Market.

266.    The fact that Ribbon did not demand a royalty or seek to enter into license negotiations before filing suit further demonstrates that Ribbon did not file the litigation to recover

on a good faith infringement claim.  The circumstances surrounding the filing of the litigation indicate instead that Ribbon instituted the suit to prevent Metaswitch from offering, and customers from purchasing, legacy DMS maintenance services as a competitive weapon to wall off Metaswitch from establishing legacy DMS maintenance customers that it could convert into network transformation customers.

267.    Indeed, while it is customary in patent infringement litigation for a patent owner to send a demand letter to an alleged infringer before filing a lawsuit, Ribbon filed its first patent infringement lawsuit against Metaswitch without warning.  Before filing suit, Ribbon did not notify Metaswitch of its claims or attempt to engage Metaswitch in a negotiation over a reasonable royalty payment.  If Ribbon's goal was to obtain reasonable royalty payments from Metaswitch for purportedly practicing Ribbon's patents, Ribbon could have, with minimal cost, simply begun a dialogue with Metaswitch.  If Ribbon and Metaswitch could not agree upon a reasonable royalty payment, Ribbon could have taken the next step of filing suit.  Instead, Ribbon chose to involve the courts immediately, at great financial expense to Metaswitch.

268.    Moreover, at least five of the patents Ribbon asserted against Metaswitch—U.S. Patent Nos. 6,772,210 ("Method and Apparatus for Exchanging Communications Between Telephone Number Based Devices in an Internet Protocol Environment"), 6,791,971 ("Method and Apparatus for Providing a Communications Service, for Communication and for Extending Packet Network Functionality"), 7,047,561 ("Firewall for Real-Time Internet Applications"), 6,934,279 and 7,995,589 ("Controlling Voice Communications over a Data Network")—were subject to royalty-free licensing under Nortel's and Ribbon's agreements with CableLabs.  In a subsequent litigation, Ribbon later asserted yet another patent, U.S. Patent No. 8,600,006 ("Voice

Continuity Among User Terminals"), against Metaswitch that was likewise encumbered with a royalty-free licensing obligation under the CableLabs Agreement.

269.     By asserting these patents, Ribbon claimed in bad faith that Metaswitch was liable for patent infringement because Metaswitch, without paying royalties, had practiced patents that Ribbon was obligated to provide to Metaswitch on a royalty-free basis.

270.     Notably, neither Ribbon nor Nortel has ever asserted these patents in litigation against anyone else, to Metaswitch's knowledge.

271.     After the court entered a damages verdict against some of Metaswitch's products in favor of Ribbon, but also after the court denied Ribbon's request for a permanent injunction, Metaswitch decided to redesign the products at issue to eliminate any further infringement issues. Nonetheless, Ribbon was undeterred.

272.     Metaswitch offered Ribbon an opportunity to inspect the redesigned products to confirm that there was no infringement.  Instead of accepting Metaswitch's offer, however, and without investigating how the new products were redesigned, Ribbon immediately filed a new patent case against Metaswitch (the "Redesign Action").  Ribbon filed the Redesign Action in bad faith, including by asserting the Nortel patents that are subject to a royalty-free licensing obligation.  Significantly, as noted above, this was after Metaswitch had specifically revised its source code to avoid any plausible claim of infringement upon Ribbon's patent rights and after Ribbon rejected an opportunity to review the revised source code.

273.     In the Redesign Action, Ribbon again seeks to obtain a permanent injunction against Metaswitch, which it knows it cannot obtain but which it wishes to use to threaten potential Metaswitch customers.  Ribbon's strategy is to run up Metaswitch's costs through bad faith litigation, without reviewing Metaswitch's revised source code, and to seek an injunction that it

61

knows will not be granted so that it can falsely tell customers that they cannot rely on Metaswitch to remain in the market. These bad faith assertions of patent rights are anticompetitive and exclusionary acts in furtherance of an unlawful monopolization scheme—not a legitimate assertion of patent rights.

274.    None of the prior litigations between Ribbon and Metaswitch have considered or adjudicated the role that Ribbon's bad faith patent-right assertions against Metaswitch have played as elements of Ribbon's unlawful scheme to monopolize or attempt to monopolize the relevant markets in violation of Section 2 of the Sherman Act.

### viii.    Ribbon Asserted Inapplicable or Non-Existent Intellectual Property Rights in Bad Faith Against Metaswitch's New Line Frame Adapters.

275.    In response to customer demand, Metaswitch sought to develop a solution for migrating legacy Class 5 switch line frames to next generation networks. At the time, a startup venture known as The New Class Five, Inc. ("New Class Five") was developing a similar product. Metaswitch acquired certain assets from New Class Five, including several patents covering the product under development. Metaswitch also brought a number of New Class Five's employees onboard to continue product development, including New Class Five's CEO, David M. Smith. The product that Metaswitch sought to develop was known as the "line frame adapter."

276.    In traditional network transformation, a network operator must replace not only its legacy TDM switches but also its access network, which uses a massive number of copper wires to connect subscriber telephone lines to line frames in the network operators' central offices, where the copper wires terminate. The work associated with disconnecting each pair of copper-wire subscriber lines from their line frame terminations and reconnecting them to next generation technology, known as "lift and lay" work, is extraordinarily time consuming and labor intensive, and it requires extensive upfront expense and work from the network operator.

277.    The cost of access network replacement far exceeds the cost of legacy TDM switch replacement.  Access network replacement typically costs around $40 to $60 per copper line, meaning a network operator with five million residential subscribers, for example, would face a cost of $200 to $300 million simply for the access network replacement *preceding* the network transformation.

278.    Metaswitch's line frame adapters would have eliminated the need for this often prohibitively expensive "lift and lay" access network replacement in the network transformation process, reducing the cost of network transformation by tens of millions of dollars or more for network operators seeking to migrate their copper lines from line frames to next-generation technology.  Indeed, the cost of "lift and lay" work can represent more than half of the total cost of network transformation.

279.    Instead of having to manually disconnect the copper lines from the line frames and reconnect them to next-generation technology, network operators would have been able to leave their copper lines and line frames in place during network transformation by using Metaswitch's line frame adapters to connect the line frame to Metaswitch's next-generation technology, thus allowing the modern VoIP technology to communicate with the undisturbed line frame in order to deliver VoIP functionality with new cost-effective features at a fraction of the expense.

280.    For about two years, around a dozen Metaswitch engineers worked to develop the line frame adapters, which would initially be compatible with the DMS-10 and DMS-100 lines of switches.

281.    Notably, prior to developing the early version of the line frame adapter, New Class Five had engaged a law firm to determine whether its development procedures would present any litigation risk.  The law firm concluded that New Class Five's planned development procedures

were proper, "should not be impeded by meritorious legal actions for infringement of copyright or trade secret laws," and had "no higher susceptibility to patent infringement matters than the general research and development population."

282.    In developing the line frame adapters, moreover, Metaswitch also took great precautions to ensure no intellectual property or other proprietary rights relating to the legacy DMS switches were infringed.  Metaswitch's line frame adapters were designed to replace interface cards in the legacy line frames with Metaswitch cards so that the line frames could be controlled by Metaswitch VoIP technology instead of their original switches, enabling a network operator to avoid having to remove and replace the legacy line frames.  When Metaswitch developed the product, it took precautions to ensure that a standard communication protocol would enable interoperability with the legacy line frames without even exposing the development team to any potentially proprietary information stored in the legacy DMS switch.  New Class Five had used a similar clean team procedure, which the law firm performing due diligence for Metaswitch determined was "legally adequate to defend against any claim of copyright infringement or trade secret misappropriation."

283.    Further, market demand drove Metaswitch's development of the line frame adapters, as several network operators had inquired whether Metaswitch was capable of performing network transformation with a product like the line frame adapters.

        **a.**      **Ribbon kills Metaswitch's first attempt to commercialize the line frame adapters by asserting undisclosed intellectual property against line frame adapter products sight-unseen.**

284.    Upon learning of Metaswitch's plans to develop the line frame adapters, Ribbon immediately threatened to sue Metaswitch.  Ribbon made these threats to several network operators, some of which passed along Ribbon's litigation threats to Metaswitch.  Ribbon's threats included not only lawsuits against Metaswitch but also lawsuits against the network operators

considering undergoing network transformation using Metaswitch's line frame adapters.  Ribbon reportedly threatened to sue customers if they even moved forward with testing the line frame adapters.

285.     The fact that Ribbon was threatening network operators if they even moved forward with testing the line frame adapters demonstrates that Ribbon could not have had a good faith basis for its threats at a time when it could not have gotten access to prototype products or information about how the product was going to work from any tests.

286.     For example, when Metaswitch was first developing the product, it received interest in the product from ███████  ████████ representatives came to Metaswitch and said they wanted to work with Metaswitch in developing a line frame adapter solution for ████████ Metaswitch was able to create a plan for █████████ that would greatly reduce the cost of the transformation with substantially lower labor costs by proposing to use the line frame adapters. ████████ however, reported to Metaswitch that Ribbon's sales personnel learned of its plan to move forward with Metaswitch and threatened to sue ████████ for infringing unspecified intellectual property.

287.     While it was not clear what intellectual property served as the basis for Ribbon's threats, there was some understanding that Ribbon was suggesting that Metaswitch's line frame adapters somehow infringed on a purportedly proprietary interface protocol, DS30A, which legacy line frames used to communicate with the legacy DMS host switches.  Metaswitch's line frame adapters, however, were not going to use the DS30A protocol.  Rather, Metaswitch's line frame adapters were programmed to use the Telcordia GR-303 standard, an internet communication protocol that was public, was free to use, and had interface definitions that were not subject to any intellectual property.

288.    Accordingly, at the time Ribbon was recklessly threatening to sue Metaswitch's prospective customers for pursuing the use of Metaswitch's line frame adapters, Ribbon did not even have a basic understanding of how Metaswitch's line frame adapters were going to work.

289.    As Metaswitch learned from █████████ executives, Ribbon had expressed that it did not care how Metaswitch's line frame adapters would work or what █████████ was going to do with the line frame adapters. Ribbon stated that it would sue █████████ regardless if it moved forward with the product. Understandably, █████████ was scared out of moving forward with Metaswitch's line frame adapters.

290.    Two other large network operators, █████████ and ██████ also expressed strong interest from the start in Metaswitch's network transformation capabilities using the line frame adapters.[3] At least four additional network operators similarly expressed interest in undergoing network transformation with Metaswitch as soon as the line frame adapters reached the market.

291.    Metaswitch's network transformation discussions with █████████ were highly promising, particularly because █████████ Vice President of Engineering was interested in the line frame adapter technology and wanted █████████ to be an early adopter. Metaswitch and █████████ agreed to a trial of the line frame adapters. Metaswitch installed a pre-general availability version of the line frame adapter in █████████ laboratories and began initial proof-of-concept testing, engaging a third-party testing company to provide its expertise. Following initial testing of the line frame adapter, █████████ provided positive feedback to Metaswitch. Armed with █████████ feedback and suggestions, Metaswitch's engineers went to work.

292.    Once Ribbon learned that █████████ was in serious discussions with Metaswitch about the line frame adapters, Ribbon executives arranged a meeting with █████████ Vice

---

[3] █████ was part of █████████████████████, which offers services in █████████.



President of Engineering.  At this meeting, Ribbon executives bluntly stated that if █████████ moved forward with Metaswitch's line frame adapters, Ribbon would bring a patent infringement lawsuit against ███████.

293.     ████████ Vice President of Engineering reported Ribbon's litigation threat to Metaswitch.  Though he initially expressed a desire to fight back against Ribbon, he left ████████ soon after, taking with him the company's willingness to press forward with Metaswitch's line frame adapters in the face of Ribbon's continuing litigation threats.

294.     █████ also expressed strong interest in modernizing its network of DMS-switched lines using Metaswitch's line frame adapters.  Metaswitch partnered with Calix Inc., a supplier of telecommunications access equipment for service providers, to submit a proposal to █████ to migrate █████ switch line frames to next-generation networks.  From the Calix representative, who maintained a close relationship with █████ Chief Technology Officer, Metaswitch learned that Ribbon employees had visited █████ premises and spread fear, uncertainty, and doubt about Metaswitch's legal ability to perform █████ network transformation using its line frame adapters.  Specifically, upon information and belief, Ribbon employees told █████ representatives that Ribbon had threatened to sue Metaswitch if it commercialized its line frame adapters and suggested that, as a result, Metaswitch would go out of business and would not be able to provide continuing transformation products and services needed for ongoing support.  Shortly following Ribbon's visit to █████ premises, █████ discontinued discussions with Metaswitch and Calix about network transformation.

295.     In addition to █████████ █████████ and █████ Metaswitch's sales team learned that Ribbon employees had told other network operators as well, including █████ and

67

████████ that Ribbon would initiate infringement actions against them if they continued to pursue network transformation projects using Metaswitch's line frame adapters.

296.   Given Ribbon's bad faith threats to customers, casting doubt on Metaswitch's ability to sell the line frame adapters without facing the risk of potential lawsuits against Metaswitch and its customers, Metaswitch was unable to move forward with line frame adapter development and sales, despite two years of successful product development and substantial investment and interest in the product.

   **b.   Ribbon kills Metaswitch's second attempt to commercialize the line frame adapters in response to customer requests.**

297.   Around 2015, Metaswitch revisited the idea of commercializing the line frame adapters at the request of a large network operator, ████████ which was considering a nationwide network transformation project. ████████ extensive nationwide network used both Nortel's DMS switches and Alcatel-Lucent's 5ESS switches.   Given the size of ████████ network and the associated network transformation costs, ████████ stressed that a product like the line frame adapters was an important aspect of the business case supporting its decision to undergo network transformation.

298.   Recognizing the value of ████████ business, Metaswitch renewed its efforts to commercialize the line frame adapters at least with respect to another type of legacy TDM switches besides DMS switches.  Specifically, Metaswitch sought to develop line frame adapters that were compatible with Alcatel-Lucent's 5ESS switches.  Metaswitch brought on New Class Five CEO David M. Smith, in a consulting capacity, to propel the product development forward.

299.   While Metaswitch worked to develop the line frame adapters for ████████ 5ESS switches, Metaswitch and ████████ engaged in detailed discussions about ████████ upcoming network transformation.  In 2016, Metaswitch prepared a specification for the project

and provided ▮▮▮▮ with a price quotation for the migration of ▮▮▮▮ 5ESS switch line frames at ▮▮▮▮▮▮▮▮ line frame adapters.

300.   ▮▮▮▮ was eager for Metaswitch to bring its line frame adapters to market. Over the course of discussions, ▮▮▮▮ representative repeatedly pressed Metaswitch to complete development of the line frame adapters and continuously inquired into the status of product development.

301.   On several occasions, ▮▮▮▮ representative told the Metaswitch salesperson responsible for the ▮▮▮▮ account that if the line frame adapters were ready, ▮▮▮▮ would immediately contract with Metaswitch to begin migrating ▮▮▮▮ 5ESS switch line frames at a number of ▮▮▮▮ switch sites.

302.   In August 2016, shortly before ▮▮▮▮ was expected to make its vendor selections for its nationwide network transformation project, ▮▮▮▮ suddenly pulled the plug on this project.  The cause was new bad faith litigation threats from Ribbon.

303.   Metaswitch found itself in a familiar situation:  It had invested time and resources into the commercialization of the line frame adapters in response to a customer request, only for demand to disappear in response to Ribbon's exclusionary conduct.

304.   In a meeting between Metaswitch and ▮▮▮▮ a ▮▮▮▮ sales representative reported that Ribbon had told ▮▮▮▮ that Ribbon was going to sue Metaswitch and force it out of business.  This bad faith behavior once again killed Metaswitch's ability to market its line frame adapters and continues to block this competition from Metaswitch to this day.

**B.   Ribbon Used Anticompetitive Acquisitions to Gain Monopoly Power in the Relevant Markets, Which It Then Leveraged to Maintain Its Monopolies Against Metaswitch Through Exclusionary Conditional Pricing Conduct**

305.   As part of Ribbon's scheme to eliminate competition, enhance its monopoly power, and raise prices to the detriment of customers and consumers, Ribbon and its predecessors engaged

in an aggressive series of anticompetitive acquisitions, eliminating competitors, and purchasing intellectual property to assert against competitors regardless of royalty-free obligations. Ribbon was then able to leverage the monopoly power it acquired to engage in exclusionary conditional pricing conduct against Metaswitch and other competitors.

306.   By 2016, Ribbon's predecessor, Genband, had already "grown from a single-product startup to one of the largest global software and communications technology companies in the world."[4]

307.   Even before Genband Holding's 2018 merger with Sonus, which created Ribbon, Genband was already the largest competitor in the network transformation industry with more than 700 commercial customers in over 80 countries.

308.   Rather than creating new and innovative products through research and development efforts, Genband's strategy has focused instead on acquiring or destroying competitors to eliminate competition.

i.   **Genband's Anticompetitive Acquisitions**

309.   In early 2006, Genband acquired Syndeo Corp., which had competed with control and softswitch products.

310.   A few months later in 2006, Genband acquired BayPackets Inc., which had messaging and video telephony applications.

311.   One month later in 2006, Genband acquired the Digital Central Office circuit-switch business of Siemens Networks LLC, including Siemens's product portfolio as well as its

---

[4] *Silicon Valley Bank's New Partnership with GENBAND Helps Fuel Growth*, PR Newswire (July 27, 2016), https://www.prnewswire.com/news-releases/silicon-valley-banks-new-partnership-with-genband-helps-fuel-growth-300304283.html.

service and support infrastructure for more than 2,500 Digital Central Office host and remote switches across North America.

312.    In 2007, Genband acquired Tekelec's Switching Solutions Group in 2007, which included Tekelec's Internet Protocol Switching business.

313.    In 2008, Genband acquired Nokia Siemens Networks' Surpass HiG media gateway product portfolio (i.e., its fixed-line media gateway product line) and entered into a long-term Original Equipment Manufacturer agreement with Nokia providing that Genband would be a preferred supplier.

314.    Also in 2008, Genband acquired NextPoint Networks, which included session border controller technology.

315.    In 2010, Genband acquired Nortel Network's Carrier VoIP and Application Solutions Business (CVAS), at which time Genband became the sole provider of legacy DMS switches used by network operators.  As set forth in paragraphs 183 through 274 above, this acquisition enabled Genband, and now Ribbon, to exercise monopoly power that Nortel unlawfully obtained by deceiving CableLabs Participants in order to incorporate Nortel patents in PacketCable Specifications while purporting to reject the royalty-free licensing obligations that accompanied those standards.  Genband, and now Ribbon, also acquired Nortel's liability for this conduct as a result of the Nortel acquisition.

316.    In 2011, Genband acquired Cedar Point Communications, which eliminated another competitor engaged in Internet Protocol switching technology.  At the time of this acquisition, Genband employees openly discussed that the purpose for the acquisition was to shut down a competitor.

317.    In 2012, Genband acquired Aztec Networks, which also included Internet Protocol switching technology.

318.    In 2013, Genband acquired Fring Ltd., relating to VoIP services to iPhone users.

319.    In 2014, Genband acquired uReach Technologies, which included voice messaging software.

### ii.    Sonus's Anticompetitive Acquisitions

320.    In 1998, Sonus acquired Telecom Technologies, Inc., which eliminated a competitor with softswitch technology.

321.    In 2008, Sonus acquired Atreus Systems, a supplier of Internet Protocol voice and advanced Internet Protocol service provisioning software.

322.    In 2012, Sonus acquired Network Equipment Technologies, Inc., which included voice and multimedia infrastructure technologies.

323.    In 2014, Sonus merged with Performance Technologies Inc., which included technology relating to network communications solutions.

324.    In 2016, Sonus entered into negotiations to purchase Taqua, LLC, which by this time was the only significant competitor besides Metaswitch still remaining in the Fixed-Line Network Transformation Market.  As Taqua pled in a complaint it filed against Sonus and Genband, in the course of merger negotiations, the CEO of Sonus represented that Sonus would expand Taqua's product line and invest resources to grow Taqua.

325.    Instead, after engaging in undisclosed merger discussions with Genband throughout 2015 and 2016, Sonus "systematically dismantle[d]" Taqua following the acquisition by, among other things, terminating the majority of Taqua's wireless technology development and sales teams.

326.    As Taqua set forth in its complaint against Sonus, "[t]he sole purpose of Sonus's restructuring plan [was] to frustrate the sale of Taqua's products," and "Sonus [was] in the process of implementing a market-consolidation strategy designed to eliminate products, like Taqua's voice-over Internet Protocol solutions, from the market in favor of its soon-to-be acquired GENBAND product line."

        a.      **The Genband-Sonus Merger Grants Monopoly Power to Ribbon.**

327.    Following Sonus's September 2016 acquisition of Taqua, Genband announced its upcoming merger with Sonus in May 2017.

328.    As Taqua describes in its 2017 complaint against Sonus, "[T]he Sonus-GENBAND merger is part of a multi-year strategy to gain control over the market and eliminate competitors like Taqua.  Once Sonus merges with GENBAND, it will successfully consolidate the network transformation industry."

329.    When Taqua filed its complaint in 2017, Taqua stated that "[t]his niche area of telecommunications modernization is known as the 'network transformation' industry and is comprised of three main competitors—GENBAND, Metaswitch, and Taqua."

330.    The merger between Genband and Sonus, which combined to create Ribbon, was completed in October 2017.

331.    Now that Taqua has been dismantled by Sonus, the "multi-year strategy to gain control over the market and eliminate competitors" has come to fruition with the exception of Metaswitch, as the sole significant challenger to the monopoly power that Ribbon acquired through anticompetitive acquisitions.

      b.      **Ribbon Leveraged Its Acquired Monopoly Power in the Legacy DMS Maintenance Market in Order to Impede Metaswitch from Competing in the Fixed-Line Network Transformation Market.**

332.    Ribbon has leveraged its acquired monopoly power in the Legacy DMS Maintenance Market to exclude Metaswitch from fixed-line network transformations by coercing customers *not* to select Metaswitch, using anticompetitive and exclusionary conditional pricing practices.  Ribbon has been able to accomplish this as a result of having blocked Metaswitch from successfully competing in the Legacy DMS Maintenance Market, in which Metaswitch currently makes no sales.

333.    Specifically, Ribbon has used its monopoly control over prices for legacy DMS maintenance services as a means to coerce legacy DMS maintenance customers to (1) purchase new network transformation products and/or services solely from Ribbon; and (2) *not* purchase network transformation products and/or services from Metaswitch.

334.    For example, customers have reported that once Ribbon took over a maintenance contract from Nortel or any of its other acquisition targets, Ribbon would raise the maintenance prices to higher levels and then tell customers they would not lower the prices unless the customers purchased new network transformation products solely from Ribbon.

335.    Customers also reported that Ribbon would threaten to charge customers *twice as much* for legacy DMS maintenance services over the long period of time required to migrate networks from legacy DMS networks to modernized VoIP-enabled networks if they chose Metaswitch to perform their network transformations or to supply related products—even if the customer did not want Ribbon's products and services.  If a customer would commit to use Ribbon instead of Metaswitch for a large transformation, Ribbon would sometimes even offer to provide the maintenance for free and thus below its average variable cost.

336.    Customers were at the mercy of Ribbon's conditional pricing tactics because they needed Ribbon to provide uninterrupted legacy DMS maintenance services while legacy networks were migrated and modernized to VoIP networks over time.   Ribbon was thus able to use the monopoly power it acquired through acquisitions in the Legacy DMS Maintenance Market to block Metaswitch from effectively competing in the Fixed-Line Network Transformation Market. This was particularly true in the absence of Metaswitch's line frame adapter products—which, as discussed at paragraphs 275 through 304 above, were blocked by Ribbon's bad faith assertions of its intellectual property rights.   Metaswitch's line frame adapters would have substantially cut down the time required to migrate networks and subscribers and thereby would have reduced the coercive effect of Ribbon's exclusionary pricing tactics for legacy DMS maintenance services.

337.    Indeed, without the availability of Metaswitch's line frame adapters, replacing just one legacy DMS switch can take six months, and network transformations for large network operators can entail the replacement of upwards of hundreds of switches spread across numerous sites, thereby requiring the uninterrupted continuation of legacy DMS maintenance services for as many as ten or more years until a large fixed-line network transformation is complete. Accordingly, coercive conditional maintenance fees are a highly effective exclusionary weapon that Ribbon has wielded to acquire and maintain its monopoly power in the Fixed-Line Network Transformation Market.  As a result of Ribbon's coercive conditional pricing conduct, Metaswitch lost the network transformation business of numerous customers that would otherwise have selected Metaswitch for their network transformation projects.

338.    For example, one customer that Ribbon subjected to its coercive monopoly leveraging tactics was ██████████████████████████, a telecommunications provider based in ████████ Metaswitch and Ribbon competed to win ████████ network

transformation business, when ███████ sought to modernize a network consisting of a large

volume of legacy DMS switches.  At the time, Ribbon was providing maintenance services for

███████ legacy DMS switches for hundreds of thousands of dollars each year.  To secure

███████ network transformation business as well, Ribbon made a coercive conditional

pricing and bundled discount offer that ███████, from a business perspective, could not refuse:

Ribbon offered to substantially decrease the price of its maintenance services for ███████

legacy DMS switches—essentially offering its maintenance services free of charge—on the

condition that ███████ did not select Metaswitch for its network transformation project.

Because ███████ could not turn down Ribbon's offer from a business perspective, Metaswitch

lost the bid for ███████ network transformation business to Ribbon.  On information and

belief, Ribbon could then recoup its legacy DMS maintenance fee losses on network

transformations, subsequent product updates, and maintenance services on the VoIP equipment it

would install during the network transformations in place of customers' legacy DMS equipment.

   339. Another customer that Ribbon subjected to monopoly leveraging was ███.

When ███ sought to modernize its network of legacy TDM switches by replacing the legacy

TDM switches with ████████████████████████████████

████████.  Ribbon and Metaswitch were the only companies competing for ███████

project, as they were the only ones capable of providing ████████████████████

███████.

   340. While considering their proposals, ███████ invited Ribbon and Metaswitch to

perform trials in ███████ laboratories.  During one informal meeting between ███████ and

Metaswitch representatives, Metaswitch learned that it had won ███████ technical evaluation.

This meant that ███████ technical team had considered the solutions proposed by Metaswitch and

Ribbon and concluded that, from a technical perspective, Metaswitch's proposed solution was superior. After the technical evaluation, the team made a recommendation to ████████████ █████████████████████████████████, who was ultimately responsible for selecting a vendor for ███████████████████████.

341.   Metaswitch also impressed █████ technical team by developing a method that would significantly reduce the length of time required to replace the legacy TDM switches in ██████████████████. Given existing technological capabilities, on information and belief, the solution presented by Ribbon would have taken over fifty years to fully implement. Seeking to improve its product and gain a competitive edge, Metaswitch's engineers set out to develop a solution that could be implemented in less time. They ultimately developed a method that would compress the time required for each switch replacement, cutting the time for the full switch replacement project from fifty or more years to only ten years. ███████ technical team responded very favorably to Metaswitch's solution. Metaswitch then developed a prototype and tested the technology in █████ laboratories, confirming that the technology worked as expected and that Metaswitch would be able to complete the switch replacement project for █████ five times faster than Ribbon.

342.   Not only did Metaswitch have a superior technical solution, but it also submitted the price that was requested by █████. After several rounds of pricing discussions, █████████ representative provided Metaswitch's representatives with the precise dollar amount that Metaswitch would need to submit to win the project. Metaswitch then lowered its proposal to match the dollar amount specifically requested by █████.

343.   Although Metaswitch had won the technical evaluation, developed a method to significantly shorten the time required for the project, and priced its solution to match ██████

requested price, Metaswitch learned that it was going to lose the business. During one meeting, █████ representative revealed that █████ executives reportedly feared "repercussions" if they did not select Ribbon for the project. At the time, ████████████████████████████ ████████████████████████████████████████. On information and belief, Ribbon had threatened to substantially increase the cost of legacy DMS maintenance services for █████ if █████ selected Metaswitch for the project.

344.   On information and belief, but for Ribbon's coercive and monopolistic pricing tactics and threats, █████ would have selected Metaswitch to perform its switch replacement project and to provide maintenance services for the ████████████████████.

345.   Another company that Ribbon subjected to monopolistic leveraging was █████ ████████. Around 2014, ████████████ developed plans to undergo a significant network transformation of its fixed-line voice networks. Prior to its network transformation, █████ ████ approached Metaswitch about providing maintenance services for some, but not all, of its legacy DMS switches, which were being serviced at the time by Ribbon. Metaswitch agreed to pursue a maintenance contract with ██████████ for the purpose of developing a relationship with the customer and eventually securing ██████████ network transformation business. On information and belief, however, Ribbon threatened to retaliate by charging supracompetitive prices for its maintenance services if ██████████ pursued more business with Metaswitch. On information and belief, Ribbon's exclusionary conditional pricing conduct effectively forced ██████████ to refrain from doing additional business with Metaswitch.

**C.    Ribbon Also Engaged in Anticompetitive and Exclusionary Conduct to Acquire and Maintain Its Monopoly Power in the Relevant Markets by Repeatedly Making Materially False and Misleading Statements About Metaswitch and Its Products to Customers.**

346.    After Metaswitch rejected Ribbon's acquisition overtures, Ribbon undertook a sustained and continuing campaign to eliminate Metaswitch as a competitor in part by engaging in the exclusionary acts of spreading false and misleading statements about Metaswitch's products and services and their continuing availability in the markets.  Ribbon's false and misleading statements were intended to—and did—dissuade numerous customers from purchasing Metaswitch's products and services.  Ribbon's false and misleading statements therefore helped Ribbon to unlawfully maintain its monopoly power in the Legacy DMS Maintenance Market and to unlawfully acquire and maintain its monopoly power in the Fixed-Line Network Transformation Market.

347.    Among other false and misleading statements, Ribbon repeatedly told potential customers that (1) Metaswitch's products and services would not be available in the near future because Ribbon was entitled to a permanent injunction against Metaswitch's use of such products and services, even though Ribbon knew that it would not be able to obtain such an injunction; (2) Metaswitch's products would not be available and Metaswitch would not be able to offer support services for those products because Metaswitch would soon be bankrupt; (3) Metaswitch's legacy DMS maintenance services infringed Ribbon's intellectual property rights when there was no plausible basis to assert such a claim; and (4) Metaswitch's line frame adapters infringed Ribbon's intellectual property rights before Ribbon even had an opportunity to examine such products for potential infringement.

348.    Ribbon actively directed employees to spread fear, uncertainty, and doubt—which Ribbon referred to as spreading "FUD"—about Metaswitch to customers, when the FUD was not

supported by fact. Former Ribbon employees have reported that the direction to spread FUD started from the top with then-CEO Charles Vogt and only got worse when his successor CEO David Walsh took over.

349.   Indeed, Ribbon's Product Line Managers were tasked with regularly distributing "FUD sheets" to employees containing conjecture, speculation, misleading and false statements, and otherwise unsupportable information about Metaswitch and other companies, including other companies they sought to acquire like Sonus. Ribbon expected its sales teams to win deals by relying on this knowingly false information and sowing FUD, rather than to win on the merits.

350.   Ribbon frequently sought to scare Metaswitch's customers and potential customers into believing that if they purchased network transformation products and services from Metaswitch, the customers would be left with a large stranded investment for expensive products that Metaswitch would not be around to support. Notably, for over five years, Ribbon has claimed that Metaswitch was likely to go bankrupt within the next year due to a combination of Ribbon's bad faith litigation against Metaswitch, the costs imposed by that litigation, and the purported likelihood of obtaining a permanent injunction against Metaswitch, which Ribbon knew it would not be able to obtain under the governing law for patent-related injunctive relief.

351.   Ribbon's repeated statements that Metaswitch was financially insolvent, would go out of business within a year, would be unable to support its products, and that Ribbon would obtain an injunction, have already been proven false. Indeed, the district court in Ribbon's initial patent litigation denied Ribbon's motion for a permanent injunction because Ribbon could not satisfy the standards for such relief, and after Ribbon appealed to the U.S Court of Appeals for the Federal Circuit and secured a remand, the district court *again* denied the permanent injunction. Yet, Ribbon kept telling customers that it would obtain such an injunction in future litigation.

352.   On information and belief, Ribbon began telling companies that Metaswitch was financially insolvent and would likely go bankrupt within a year starting in 2013, and it has continued to spread this false claim since that time. For example, Ribbon made false statements about Metaswitch's financial health and the continued viability of its products to companies including, but not limited to, ████████████████, Logix Communications, GTA Teleguam, ██████████████████████████████. These statements caused Metaswitch to lose substantial business. For instance, Ribbon told one Metaswitch customer that it should not buy Metaswitch's products because Metaswitch would not be around to support those products. Ribbon also falsely stated that Metaswitch was a very small company and that Metaswitch was insolvent. Ribbon made these statements in bad faith and with knowledge of their falsity, or with reckless disregard for their truth or falsity, as part of its campaign to eliminate Metaswitch from the Fixed-Line Network Transformation Market.

353.   Just recently in May 2018, one of Metaswitch's largest customers, ██████████ , asked to meet with Metaswitch senior management "because ████████ ██████████████ had been told some quite negative things about [Metaswitch's] financial health," including "that [Metaswitch's] investor Francisco Partners was very unhappy with [Metaswitch's] financial performance and was ready to take [Metaswitch] into bankruptcy." The representative from ██████████████████████ said that he "had to have this meeting" with Metaswitch and "give a positive report back to the Board Member in order to continue to do business with [Metaswitch]." On information and belief, the disparaging statements to ██████████ ██████████████ were made by a member of Ribbon's Board of Directors or an employee of One Equity Partners.

354.    Collectively and individually, Ribbon's misrepresentations were literally false and/or misleading, relate to material characteristics Metaswitch products and services, were likely to and did induce reliance by customers who were unaware of Ribbon's misrepresentations, continued over a prolonged period of time, and could not be neutralized or offset by Metaswitch, owing to the vast resources expended by Ribbon in disseminating these messages and the innumerable ways in which those messages have been spread.  Beyond the business Metaswitch lost as a result of Ribbon's false and misleading statements, Metaswitch incurred damages relating to accounts it won, such as from the cost of increased insurance limits to assuage customer fear of bankruptcy due to Ribbon's false statements, the costs of delay in closing contracts, and other increased contracting costs.

## VIII. RIBBON'S EXCLUSIONARY CONDUCT HAS CAUSED SUBSTANTIAL HARM TO COMPETITION, CUSTOMERS, ULTIMATE CONSUMERS, AND METASWITCH

### A.    Anticompetitive Harm to Competition

355.    Ribbon's multiyear strategy to monopolize the relevant markets, including its exclusionary actions to drive competitors out of the market or force them into acquisition, has caused substantial harm to competition in the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market.

356.    Metaswitch is now the only remaining significant competitor left in the Fixed-Line Network Transformation Market to have resisted Ribbon's exclusionary conduct and attempts to force Metaswitch into acquiescence to acquisition.

357.    Ribbon's conduct has excluded Metaswitch completely from successfully providing legacy DMS maintenance services and entering the Legacy DMS Maintenance Market.

358.    Ribbon has engaged in anticompetitive tactics to drive other competitors out of the market, or force or deceive them into acquisition.

82

359.   Ribbon's exclusionary conduct has enabled Ribbon to acquire and maintain monopoly power in the relevant markets; to eliminate virtually all competition except for Metaswitch from the Fixed-Line Network Transformation Market; and, with the exception of one or more small third-party repair vendors, to eliminate all competition, including Metaswitch, from the Legacy DMS Maintenance Market.

360.   Through its monopolistic and coercive pricing conduct, Ribbon has reduced output in the relevant markets.  Indeed, some customers have foregone or delayed necessary network transformation projects because of Ribbon's monopolistic and coercive pricing conduct.

**B.    Anticompetitive Harm to Customers**

361.   Ribbon's anticompetitive conduct has caused substantial anticompetitive harm to network operators by leaving them with little choice but to select Ribbon for their network transformations and legacy DMS maintenance services, often at supracompetitive monopoly prices.

362.   Ribbon used its anticompetitive and exclusionary conduct to establish itself as one of only two viable options left in the Fixed-Line Network Transformation Market.

363.   Ribbon also used its anticompetitive and exclusionary conduct to establish itself as the dominant provider of DMS maintenance services in the Legacy DMS Maintenance Market because network operators are hesitant to entrust the maintenance of their complex and expansive networks with small, local third-party repair vendors, which would ordinarily contract with larger telecommunications company like Ribbon and Metaswitch to secure business from network operators.

364.   Ribbon's monopoly position in both the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market has led to an increase in prices to customers and a reduction in product quality, variation, and output.

365.    Even among network operators that were willing to consider Metaswitch for their network transformation and maintenance needs despite Ribbon's bad faith assertion of intellectual property and false FUD representations, Ribbon's exclusionary conditional pricing conduct left network operators seeking to modernize their fixed-line voice networks—which required both a network transformation process and legacy DMS maintenance services during the transformation process—with two options: (1) choose Ribbon's network transformation and legacy DMS maintenance services, and accept the supracompetitive prices that Ribbon was able to charge as the sole competitor capable of providing both services; or (2) choose Metaswitch's network transformation services and Ribbon's legacy DMS maintenance services, but accept that Ribbon, in retaliation, would charge supracompetitive maintenance prices.

366.    In many cases, network operators were coerced into staying with Ribbon even though they believed that Metaswitch offered higher quality, more reliable, and/or more cost-effective products and services. Indeed, network operators complained to Metaswitch's sales team on multiple occasions that Ribbon provided poor service, overpriced its products and services, and treated customers poorly. Yet, such customers concluded they had no choice but to deal with Ribbon given its monopoly power and coercive behavior.

367.    Ribbon's anticompetitive and exclusionary conduct further harmed network operators by chilling product innovation through the bad faith assertion of intellectual property and litigation threats. This included the suppression of Metaswitch' line frame adapters, which would have provided substantial benefits and cost savings to network operators, as well as the ██████████████████████████████████████████, which would have significantly reduced the length of time required for switch replacement projects.

368.     Additionally, Ribbon's anticompetitive and exclusionary conduct has caused substantial delays in the replacement of aging infrastructure.  In several cases, Ribbon's conduct has caused network operators to forgo network transformation altogether.  As a result, network operators and their subscribers are at greater risk of switch failure, major service interruptions, and outages.

## C.     Anticompetitive Harm to Consumer Subscribers

369.     Ribbon's anticompetitive conduct has not only harmed competition in the relevant markets and the network operators in those markets, but it has also caused anticompetitive harm to the ultimate consumers of telecommunications network services: the individuals, businesses, and government agencies that subscribe to telecommunication network services, including VoIP telephone services, from network operators.

370.     Given the position in which Ribbon's anticompetitive conduct placed network operators, subscribers faced the following options: (1) remain with a network operator that chose to forgo network transformation and to continue paying Ribbon supracompetitive prices to service its legacy DMS switches, which risked catastrophic shutdowns and resulted in higher maintenance costs passed down to subscribers, or (2) choose a network operator that acquiesced to Ribbon's supracompetitive pricing for network transformation and legacy DMS maintenance services, which also resulted in higher costs passed down to subscribers.  In either situation, the subscribers also suffered anticompetitive effects in the form of higher prices, reduced product quality, and reduced consumer choice.

371.     By depriving the Fixed-Line Network Transformation Market of Metaswitch's line frame adapters, Ribbon also deprived subscribers of substantial cost savings that network operators could have enjoyed and passed onto subscribers if Ribbon had not blocked Metaswitch from commercializing the line frame adapters.

372.     Further, because Ribbon's anticompetitive and exclusionary conduct has caused substantial delays in the replacement of aging infrastructure, subscribers are at greater risk of losing voice service for hours or days at a time.  Such outages can affect individuals, businesses, government agencies, as well as essential service providers like police stations, fire stations, and hospitals.

**D.     Anticompetitive Harm and Damages to Metaswitch**

373.     Ribbon's wide range of anticompetitive and exclusionary conduct, including its exclusionary monopoly leveraging and conditional pricing conduct, knowingly false FUD statements about Metaswitch, and bad faith threats to initiate patent infringement actions against Metaswitch and its customers without a plausible basis to do so, or based upon patents that were required to have been offered on a royalty-free basis, harmed Metaswitch by causing many of Metaswitch's existing and prospective customers (1) to forgo business with Metaswitch entirely, or to purchase fewer products and reduced services from Metaswitch, which could have included product sales and services that would be continuing today, or (2) to conduct business with Metaswitch only on contract terms that were economically disadvantageous to Metaswitch.

374.     The revenues that Metaswitch has lost from fixed-line network transformation customers as a result of Ribbon's anticompetitive and exclusionary conduct has totaled at least many hundreds of millions of dollars and substantial lost profits to Metaswitch in an amount to be determined at trial.

375.     Metaswitch has also lost substantial profits as a result of the more onerous terms it has been forced to accept from such customers in the face of Ribbon's anticompetitive and exclusionary conduct in an amount to be determined at trial.  In some cases, Metaswitch has been forced to include indemnity clauses in its customer contracts that are specific to litigation with

Ribbon, as well as carve-outs from the limit of liability for Ribbon litigation because customers were worried about litigation and injunction threats from Ribbon.

376.   Metaswitch has further lost substantial revenues and profits, in an amount to be determined at trial, and important customers, as a result of being excluded from the Legacy DMS Maintenance Market.

377.   Metaswitch has also lost substantial revenues and profits, in an amount to be determined at trial, and important customers, as a result of being unable to commercialize and sell its line frame adapters and the migration panel solution it developed.

378.   Ribbon's exclusionary conduct is also causing and will continue to cause irreparable harm to the reputation and goodwill of Metaswitch, which cannot be remedied by monetary damages alone.

## CAUSES OF ACTION

### COUNT I

**Monopolization of the Fixed-Line Network Transformation Market
Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

379.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 378 as if fully set forth herein.

380.   As detailed above (*see* paragraphs 110 through 126), Ribbon has monopoly power in the Fixed-Line Network Transformation Market, including the power to control prices and exclude competition.

381.   As alleged herein, Ribbon has willfully and intentionally engaged in anticompetitive and exclusionary conduct in order to unlawfully acquire and maintain its monopoly in this Fixed-Line Network Transformation Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

382.    Ribbon has effectively monopolized, and further threatens to maintain its monopoly of, competition in the Fixed-Line Network Transformation Market by, among other exclusionary acts:

a.    Acquiring competitors to eliminate competition in the market;

b.    Asserting (often newly acquired) patents in bad faith against Metaswitch and its customers, including patents with exclusionary power attained through standard-setting manipulation that should have been included in royalty-free licenses;

c.    Filing a series of bad faith and objectively unreasonable lawsuits, and making threats of such lawsuits, against Metaswitch in an attempt to wear Metaswitch down and either force a merger or drive Metaswitch out of business as opposed to adjudicating claims on the merits;

d.    Making materially false representations to customers regarding Metaswitch's finances, products, services, and ability to compete in the relevant markets;

e.    Pricing below average variable cost on certain business, to prevent Metaswitch from winning business, with a reasonable prospect of recouping the losses from monopoly pricing on other products;

f.    Leveraging its monopoly power in the Legacy DMS Maintenance Market to exclude Metaswitch from competing in the Fixed-Line Network Transformation Market by engaging in exclusionary conditional pricing conduct—specifically, by threatening to charge supracompetitive prices for maintenance services for customers that chose to do business with Metaswitch or that did not do business only with Ribbon;

g.  Offering bundled discounts to customers conditioned on those customers only doing business with Ribbon for network transformation; and

h.  Willfully and intentionally using its monopoly power in the Legacy DMS Maintenance Market to unlawfully maintain or attempt to maintain monopoly power in the Fixed-Line Network Transformation Market—specifically, by falsely asserting that no other company is legally capable of providing any sort of maintenance service on legacy DMS switches, threatening bad faith intellectual property litigation against Metaswitch and customers seeking to purchase legacy DMS maintenance services from Metaswitch, and threatening to charge supracompetitive prices on legacy DMS maintenance services for customers that choose Metaswitch for their network transformations.

383.    As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and exclusionary conduct to acquire or maintain a monopoly in this relevant market, Metaswitch has been injured in its business and property, with resultant damages in amounts to be proven at trial, in at least the following ways: (1) Metaswitch has lost substantial business and customers and profits; (2) Metaswitch has paid substantial legal fees defending against Ribbon's bad faith assertion of intellectual property rights; (3) Metaswitch's costs of doing business have increased, including costs associated with increased contracting time, the purchase of substantial insurance policies, and other onerous contracting terms due to customer fear of bad faith litigation from Ribbon; and (4) Metaswitch has been substantially foreclosed from competing in the relevant markets.

384.    As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and monopolistic conduct, competition, customers, and ultimate consumers in the Fixed-Line Network

Transformation Market have been harmed by, among other things: (1) Ribbon's ability to charge supracompetitive prices for fixed-line network transformation; (2) the reduced availability of competitive options and preferred products and services; (3) lower quality products and services; (4) the reduced output and availability of network transformations; and (5) the reduced output and availability of new innovative products and services.

385.    Metaswitch has also suffered substantial irreparable damage to its goodwill and reputation by Ribbon's unlawful conduct that cannot be fully compensated in monetary damages alone.

386.    Ribbon's anticompetitive and exclusionary conduct affected a significant volume of interstate commerce.

<h3 align="center">COUNT II</h3>

**Attempted Monopolization of the Fixed-Line Network Transformation Market
Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

387.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 386 as if fully set forth herein.

388.    As detailed above, Ribbon has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Fixed-Line Network Transformation Market, including the power to control prices and exclude competition.

389.    Ribbon has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Fixed-Line Network Transformation Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

390.    Ribbon's anticompetitive conduct alleged herein—as set forth in paragraphs 183 through 354 above—has been directed at accomplishing the unlawful objective of controlling

prices and/or preventing competition in the Fixed-Line Network Transformation Market by, among other exclusionary acts:

    a.  Acquiring competitors to eliminate competition in the market;

    b.  Asserting (often newly acquired) patents in bad faith against Metaswitch and its customers, including patents with exclusionary power attained through standard-setting manipulation that should have been included in royalty-free licenses;

    c.  Filing a series of bad faith and objectively unreasonable lawsuits, and making threats of such lawsuits, against Metaswitch in an attempt to wear Metaswitch down and either force a merger or drive Metaswitch out of business as opposed to adjudicating claims on the merits;

    d.  Making materially false representations to customers regarding Metaswitch's finances, products, services, and ability to compete in the relevant markets;

    e.  Pricing below average variable cost on certain business, to prevent Metaswitch from winning business, with a reasonable prospect of recouping the losses from monopoly pricing on other products;

    f.  Leveraging its monopoly power in the Legacy DMS Maintenance Market to exclude Metaswitch from competing in the Fixed-Line Network Transformation Market by engaging in exclusionary conditional pricing conduct—specifically, by threatening to charge supracompetitive prices for maintenance services for customers that chose to do business with Metaswitch or that did not do business only with Ribbon;

    g.  Offering bundled discounts to customers conditioned on those customers only doing business with Ribbon for network transformation; and

h. Willfully and intentionally using its monopoly power in the Legacy DMS Maintenance Market to unlawfully maintain or attempt to maintain monopoly power in the Fixed-Line Network Transformation Market—specifically, by falsely asserting that no other company is legally capable of providing any sort of maintenance service on legacy DMS switches, threatening bad faith intellectual property litigation against Metaswitch and customers seeking to purchase legacy DMS maintenance services from Metaswitch, and threatening to charge supracompetitive prices on legacy DMS maintenance services for customers that choose Metaswitch for their network transformations.

391. Ribbon's anticompetitive conduct presents a dangerous probability that Ribbon will succeed, to the extent it has not already, in its attempt to monopolize the Fixed-Line Network Transformation Market.

392. As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and exclusionary conduct to acquire or maintain a monopoly in this relevant market, Metaswitch has been injured in its business and property, with resultant damages in amounts to be proven at trial, in at least the following ways: (1) Metaswitch has lost substantial business and customers and profits; (2) Metaswitch has paid substantial legal fees defending against Ribbon's bad faith assertion of intellectual property rights; (3) Metaswitch's costs of doing business have increased, including costs associated with increased contracting time, the purchase of substantial insurance policies, and other onerous contracting terms due to customer fear of bad faith litigation from Ribbon; and (4) Metaswitch has been substantially foreclosed from competing in the relevant markets.

393.    As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and monopolistic conduct, competition, customers, and ultimate consumers in the Fixed-Line Network Transformation Market have been harmed by, among other things: (1) Ribbon's ability to charge supracompetitive prices for fixed-line network transformation; (2) the reduced availability of competitive options and preferred products and services; (3) lower quality products and services; (4) the reduced output and availability of network transformations; and (5) the reduced output and availability of new innovative products and services.

394.    Metaswitch has also suffered substantial irreparable damage to its goodwill and reputation by Ribbon's unlawful conduct that cannot be fully compensated in monetary damages alone.

395.    Ribbon's anticompetitive and exclusionary conduct affected a significant volume of interstate commerce.

## COUNT III

### Monopolization of the Legacy DMS Maintenance Market
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

396.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 395 as if fully set forth herein.

397.    As detailed above, Ribbon has monopoly power in the Legacy DMS Maintenance Market, including the power to control prices and exclude competition.

398.    As alleged herein, Ribbon has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

399.    Ribbon has effectively monopolized, and further threatens to maintain its monopoly of, competition in the Legacy DMS Maintenance Market by, among other exclusionary acts:

a. Acquiring competitors to eliminate competition in the market;

b. Asserting (often newly acquired) patents in bad faith against Metaswitch and its customers, including patents with exclusionary power attained through standard-setting manipulation that should have been included in royalty-free licenses;

c. Filing a series of bad faith and objectively unreasonable lawsuits, and making threats of such lawsuits, against Metaswitch in an attempt to wear Metaswitch down and either force a merger or drive Metaswitch out of business as opposed to adjudicating claims on the merits;

d. Making materially false representations to customers regarding Metaswitch's finances, products, services, and ability to compete in the relevant markets;

e. Pricing below average variable cost on certain business, to prevent Metaswitch from winning business, with a reasonable prospect of recouping the losses from monopoly pricing on other products;

f. Offering bundled discounts to customers conditioned on those customers only doing business with Ribbon for network transformation; and

g. Falsely asserting that no other company is legally capable of providing any sort of maintenance service on legacy DMS switches.

400.   As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and exclusionary conduct to acquire or maintain a monopoly in this relevant market, Metaswitch has been injured in its business and property, with resultant damages in amounts to be proven at trial, in at least the following ways: (1) Metaswitch has lost substantial business and customers and profits; (2) Metaswitch has paid substantial legal fees defending against Ribbon's bad faith assertion of intellectual property rights; (3) Metaswitch's costs of doing business have increased,

including costs associated with increased contracting time, the purchase of substantial insurance policies, and other onerous contracting terms due to customer fear of bad faith litigation from Ribbon; and (4) Metaswitch has been substantially foreclosed from competing in the relevant markets.

401.    As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and monopolistic conduct, competition, customers, and ultimate consumers in the Legacy DMS Maintenance Market have been harmed by, among other things: (1) Ribbon's ability to charge supracompetitive prices for legacy DMS maintenance services; (2) the reduced availability of competitive options and preferred products and services; (3) lower quality products and services; and (4) the reduced output and availability of new innovative products and services.

402.    Metaswitch has also suffered substantial irreparable damage to its goodwill and reputation by Ribbon's unlawful conduct that cannot be fully compensated in monetary damages alone.

403.    Ribbon's anticompetitive and exclusionary conduct affected a significant volume of interstate commerce.

## COUNT IV

**Attempted Monopolization of the Legacy DMS Maintenance Market**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

404.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 403 as if fully set forth herein.

405.    As detailed above, Ribbon has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Legacy DMS Maintenance Market, including the power to control prices and exclude competition.

406.    Ribbon has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Legacy DMS Maintenance Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

407.    Ribbon's anticompetitive conduct alleged herein—as set forth in paragraphs 183 through 354 above—has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Legacy DMS Maintenance Market by, among other exclusionary acts:

    a.   Acquiring competitors to eliminate competition in the market;

    b.   Asserting (often newly acquired) patents in bad faith against Metaswitch and its customers, including patents with exclusionary power attained through standard-setting manipulation that should have been included in royalty-free licenses;

    c.   Filing a series of bad faith and objectively unreasonable lawsuits, and making threats of such lawsuits, against Metaswitch in an attempt to wear Metaswitch down and either force a merger or drive Metaswitch out of business as opposed to adjudicating claims on the merits;

    d.   Making materially false representations to customers regarding Metaswitch's finances, products, services, and ability to compete in the relevant markets;

    e.   Pricing below average variable cost on certain business, to prevent Metaswitch from winning business, with a reasonable prospect of recouping the losses from monopoly pricing on other products;

    f.   Offering bundled discounts to customers conditioned on those customers only doing business with Ribbon for network transformation; and

g. Falsely asserting that no other company is legally capable of providing any sort of maintenance service on legacy DMS switches.

408. Ribbon's anticompetitive conduct presents a dangerous probability that Ribbon will succeed, to the extent it has not already, in its attempt to monopolize the Legacy DMS Maintenance Market.

409. As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and exclusionary conduct to acquire or maintain a monopoly in this relevant market, Metaswitch has been injured in its business and property, with resultant damages in amounts to be proven at trial, in at least the following ways: (1) Metaswitch has lost substantial business and customers and profits; (2) Metaswitch has paid substantial legal fees defending against Ribbon's bad faith assertion of intellectual property rights; (3) Metaswitch's costs of doing business have increased, including costs associated with increased contracting time, the purchase of substantial insurance policies, and other onerous contracting terms due to customer fear of bad faith litigation from Ribbon; and (4) Metaswitch has been substantially foreclosed from competing in the relevant markets.

410. As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and monopolistic conduct, competition, customers, and ultimate consumers in the Legacy DMS Maintenance Market have been harmed by, among other things: (1) Ribbon's ability to charge supracompetitive prices for legacy DMS maintenance services; (2) the reduced availability of competitive options and preferred products and services; (3) lower quality products and services; and (4) the reduced output and availability of new innovative products and services.

411.    Metaswitch has also suffered substantial irreparable damage to its goodwill and reputation by Ribbon's unlawful conduct that cannot be fully compensated in monetary damages alone.

412.    Ribbon's anticompetitive and exclusionary conduct affected a significant volume of interstate commerce.

## COUNT V

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

413.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 412 as if fully set forth herein.

414.    As detailed above (*see* paragraphs 135 through 159), Ribbon has sufficient economic power in the Legacy DMS Maintenance Market to coerce network operators into agreeing to purchase maintenance services and/or fixed-line network transformation products and services from Ribbon, even when they would prefer to do so from Metaswitch.

415.    Ribbon has engaged in coercive pricing practices by, among other anticompetitive acts:

a.  Coercing customers to agree to purchase fixed-line network transformation products and services from Ribbon by threatening to charge supracompetitive prices for legacy DMS maintenance services;

b.  Coercing customers to agree to not to purchase fixed-line network transformation products and services from Metaswitch by threatening to charge supracompetitive prices for legacy DMS maintenance services;

c.  Coercing customers to agree to purchase fixed-line network transformation products and services from Ribbon by threatening to charge supracompetitive

98

prices for legacy DMS maintenance services unless customers agree not to purchase fixed-line network transformation products and services from Metaswitch;

d. Coercing customers to agree to purchase fixed-line network transformation products and services from Ribbon by providing discounts below average variable cost on legacy DMS maintenance services conditioned on the agreement that the customers will not purchase fixed-line network transformation products and services from Metaswitch or will only use Ribbon for network transformation;

e. Coercing customers to agree to purchase additional and/or continuing legacy DMS and/or legacy TDM maintenance services from Ribbon by threatening to charge supracompetitive prices for a remaining portion of legacy DMS maintenance services provided by Ribbon;

f. Coercing customers not to purchase legacy DMS and/or legacy TDM maintenance services from Metaswitch by threatening to charge supracompetitive prices for a portion of legacy DMS and/or legacy TDM maintenance services provided by Ribbon.

416.    Ribbon actually coerced customers to agree not to do business with Metaswitch or to select Ribbon instead for their fixed-line network transformation projects.

417.    Ribbon's coercive pricing conduct effectively tied its fixed-line network transformation products and services to its legacy DMS maintenance services.

418.    As a direct and proximate result of Ribbon's coercive pricing conduct, Metaswitch has incurred substantial damages because it has lost the network transformation business of numerous customers that would have selected Metaswitch for their network transformation projects, but for Ribbon's coercive pricing conduct.

419.    As a result of Ribbon's conditional and bundled discounts, Ribbon substantially foreclosed competition in the Fixed-Line Network Transformation Market by coercing network operators not to purchase fixed-line network transformation products and services from Metaswitch, Ribbon's only remaining significant competitor in the Fixed-Line Network Transformation Market.

420.    As a result of Ribbon's conditional discounts, Ribbon substantially foreclosed competition in the Legacy DMS Maintenance Market by coercing network operators not to purchase legacy DMS and/or TDM maintenance services from Metaswitch, Ribbon's former competitor in the Legacy DMS Maintenance Market.   Ribbon's anticompetitive conduct is currently completely excluding Metaswitch from the Legacy DMS Maintenance Market.

421.    As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and exclusionary use of coercive pricing, Metaswitch has been injured in its business and property, with resultant damages in amounts to be proven at trial, in at least the following ways: (1) Metaswitch has lost substantial business and customers and profits; (2) Metaswitch has paid substantial legal fees defending against Ribbon's bad faith assertion of intellectual property rights; (3) Metaswitch's costs of doing business have increased, including costs associated with increased contracting time, the purchase of substantial insurance policies, and other onerous contracting terms due to customer fear of bad faith litigation from Ribbon; and (4) Metaswitch has been substantially foreclosed from competing in the relevant markets.

422.    As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and exclusionary coercive pricing conduct, competition, customers, and ultimate consumers in the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market have been harmed by, among other things:  (1) Ribbon's ability to charge supracompetitive prices for fixed-

line network transformation and legacy DMS maintenance services; (2) the reduced availability of competitive options and preferred products and services; (3) lower quality products and services; (4) the reduced output and availability of network transformations and legacy DMS maintenance services; (5) the reduced output and availability of new innovative products and services.

423.    Metaswitch has also suffered substantial irreparable damage to its goodwill and reputation by Ribbon's unlawful conduct that cannot be fully compensated in monetary damages alone.

424.    Ribbon's anticompetitive and coercive pricing conduct affected a significant volume of interstate commerce.

<u>**COUNT VI**</u>

**Patent Misuse**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

425.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 424 as if fully set forth herein.

426.    Ribbon unlawfully misused its patents by asserting them beyond the scope of the right granted by such patents to exclude others from practicing the claimed inventions.  Ribbon's patent misuse has been done with both anticompetitive purpose and effect.

427.    First, Ribbon threated intellectual property litigation against Metaswitch for entering the Legacy DMS Maintenance Market, when Ribbon's patents (which it acquired from Nortel) cover only the legacy DMS products themselves, and not the usage, services, repair, or maintenance relating to those products.  Even Ribbon sells and tracks the revenue for maintenance service separate from that of product sales.

428.    Ribbon also misused its patents by asserting them against Metaswitch and its customers in litigation and in threats even though they were encumbered with the obligation to

101

license either royalty-free or on fair, reasonable, and non-discriminatory terms under various standards.

429.    Additionally, Ribbon threatened Metaswitch with patent infringement litigation if Metaswitch pursued its line frame adapter product.  Numerous network operators had asked for a product such as the line frame adapters, which would have helped bring down the time and substantial labor costs of network transformation due to the extensive manual transfers of the copper wirelines otherwise required.

430.    Metaswitch's line frame adapters complied with an open industry standard and would not have infringed any Ribbon patent.  Nonetheless, Ribbon asserted undisclosed patents and/or other intellectual property against Metaswitch and its customers with a reckless disregard for any legitimate legal right to do so.  Ribbon's conduct forced Metaswitch to discontinue developing this product despite the substantial investment of time and money and the significant interest from customers.

431.    Ribbon has also misused its patents by asserting its patents in bad faith outside the geographic scope of U.S. patents.  For example, Metaswitch was forced to incur increased costs relating to at least one customer in Canada based on concerns relating to litigation over U.S. patents.

432.    As a result of Ribbon's patent misuse, competition has been harmed because, among other things, Ribbon's patent misuse has substantially foreclosed its competitors from the Legacy DMS Maintenance Market, prevented innovative and cost-saving products to be commercialized as requested by network operators, and imposed substantial additional costs on competitors and on the price of network transformation for customers in the Fixed-Line Network Transformation Market, thereby reducing output and restraining competition.  Metaswitch has also

been forced to pay attorneys' fees and costs that otherwise would have been spent innovating new products for the Fixed-Line Network Transformation Market.

433.    A declaration that Ribbon may not lawfully exclude Metaswitch from performing legacy DMS switch maintenance services and from pursuing its line frame adapters based on any patent rights and/or other intellectual property is necessary to end Ribbon's unlawful assertions of its patents and/or intellectual property beyond any lawfully granted rights.

## COUNT VII

### False Advertising
### Violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)

434.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 433 as if fully set forth herein.

435.    Ribbon has willfully misrepresented and/or omitted material facts, features, qualities, and characteristics of Metaswitch's products and services, including its ability to provide products and services on an ongoing basis, in advertising and promotional activity that took place in interstate commerce and, on information and belief, have been widely disseminated to substantial numbers of actual and potential Metaswitch customers in the course of Ribbon's advertising of its products and services in connection with competitive bids against Metaswitch.

436.    Each of the uses by Ribbon of false and misleading representations and omissions of material fact set forth above, including but not limited to the aforesaid claims and suggestions (direct or implied) that Metaswitch is likely to go bankrupt such that Metaswitch's products and services would no longer be available; that Metaswitch's products and/or services infringed upon Ribbon's intellectual property rights; that Ribbon would obtain an injunction to prevent Metaswitch from selling its products and services; and that Ribbon's intellectual property rights and/or proprietary information prevented Metaswitch from being able to provide maintenance

services on legacy DMS switches or to provide a line frame adapter product bringing down the cost of fixed-line network transformation, constitute, individually and in combination, a misleading use of a word, term, and name that tends to deceive or mislead consumers and the trade in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

437.    Ribbon has willfully continued making these claims in spite of its awareness of their falsity and/or potential to mislead.

438.    On further information and belief, these misrepresentations, collectively and individually, have in fact confused, misled, and deceived customers; deprived Metaswitch of substantial sales to customers; threatened the loss of substantial future sales; and caused significant harm to Metaswitch's goodwill and reputation, further hurting Metaswitch's ability to compete for future sales.

439.    These false and misleading statements have been made in private communications with customers to dissuade them from purchasing products and services from Metaswitch. Because these conversations have been made in private, Metaswitch has largely been unable to correct the false and misleading information being spread by Ribbon.

440.    These false and misleading statements were made for the purpose of eliminating Metaswitch as a competitor and unlawfully acquiring and maintaining Ribbon's monopoly power in the relevant markets.

**COUNT VIII**

**Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, et seq.**

441.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 440 as if fully set forth herein.

442.    The violations of Sections 1 and 2 of the Sherman Act set forth above also constitute violations of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340-47, as Ribbon has established and

maintained its monopoly through numerous acquisitions and combinations of competitors, and subsequent monopoly leveraging, unlawful tying, and other exclusionary agreements that constitute concerted and unreasonably anticompetitive actions in violation of the Donnelly Act.

443. Ribbon has also engaged in concerted conduct with One Equity Partners in furtherance of eliminating competitors and consolidating the relevant markets for the explicit purpose of raising prices. One Equity Partners has helped fund Ribbon's acquisitions and, on information and belief, has assisted in spreading false and misleading information about Metaswitch for the purpose of restraining competition.

444. As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and exclusionary use of coercive pricing, Metaswitch has suffered injury to its competitive interest in its business, with resultant damages in amounts to be proven at trial, in at least the following ways: (1) Metaswitch has lost substantial business and customers and profits; (2) Metaswitch has paid substantial legal fees defending against Ribbon's bad faith assertion of intellectual property rights; (3) Metaswitch's costs of doing business have increased, including costs associated with increased contracting time, the purchase of substantial insurance policies, and other onerous contracting terms due to customer fear of bad faith litigation from Ribbon; and (4) Metaswitch has been substantially foreclosed from competing in the relevant markets.

445. As a direct, foreseeable, and proximate result of Ribbon's anticompetitive and exclusionary conduct, competition, customers, and ultimate consumers in the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market have been harmed by, among other things: (1) Ribbon's ability to charge supracompetitive prices for fixed-line network transformation and legacy DMS maintenance services; (2) the reduced availability of competitive options and preferred products and services; (3) lower quality products and services; (4) the

reduced output and availability of network transformations and legacy DMS maintenance services; and (5) the reduced output and availability of new innovative products and services.

446.    Metaswitch has also suffered substantial irreparable damage to its goodwill and reputation by Ribbon's unlawful conduct that cannot be fully compensated in monetary damages alone.

## COUNT IX

### Deceptive Acts
### Violation of New York General Business Law § 349

447.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 446 as if fully set forth herein.

448.    Numerous false statements were disseminated from Ribbon's predecessor, Genband's, New York office.

449.    Ribbon made numerous material and false statements about the sustainability of Metaswitch's business, the likelihood that Metaswitch would go bankrupt, and Metaswitch's purported infringement of Ribbon's patents, which have misled or are likely to mislead Metaswitch's customers and prospective customers.  This false advertising campaign was and is undertaken in both objective and subjective bad faith, as set forth in further detail above. Ribbon's conduct was immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers, and members of the public are likely to be deceived.

450.    As a direct, proximate, and foreseeable result of Ribbon's wrongful conduct, Metaswitch has suffered harm in New York and elsewhere.  Metaswitch has suffered an economic injury in fact, including the loss of money from lost sales, revenue, and market share; increased costs; and unnecessary litigation expenses as a result of Ribbon's deceptive business acts and practices.

## COUNT X

**Unfair Competition and False Advertising**
**Violation of Cal. Bus. & Prof. Code §§ 17200–17210 and 17500**

451.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 450 as if fully set forth herein.

452.    Ribbon has engaged in unfair competition and false advertising within the meaning of Cal. Bus. & Prof. Code §§ 17200–17210 and 17500.

453.    Ribbon's conduct constitutes unlawful and unfair business acts or practices, including but not limited to: (1) making material and false statements to Metaswitch's customers that have misled or are likely to mislead Metaswitch's customers and prospective customers about the sustainability of Metaswitch's business and ongoing viability of its products and services; (2) asserting patents in bad faith; (3) carrying out a pattern of anticompetitive sham litigation against Metaswitch; (4) consolidating the Fixed-Line Network Transformation Market to raise prices for customers; (5) preventing competitors from providing legacy DMS maintenance services; (6) preventing Metaswitch from commercializing competitive line frame adapter products. This conduct has, in part, been directed at and caused injury to Metaswitch in California, where Metaswitch maintains its headquarters.

454.    As a direct, proximate, and foreseeable result of Ribbon's wrongful conduct, competition in the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market, and California consumers, have been injured in California.  Ribbon's wrongful conduct brings a significant threat of injury to innovation, development, quality, and price competition for devices including softswitches, media gateways, session border controllers, line frame adapters, and other telephony products, causing injury to consumers in California and elsewhere.

455.    Ribbon's anticompetitive campaign against Metaswitch, and other competitors on information and belief, along with wrongful efforts to consolidate the markets, threaten competition, constituting unlawful and unfair business acts or practices under Cal. Bus. & Prof. Code § 17200.   Most recently, Ribbon has continued its wrongful attempt to consolidate the markets through the merger between Genband and Sonus, which acquired competitor Taqua just prior to merging with Genband, and Ribbon's subsequent acquisition of Edgewater Communications in 2018.   Ribbon's efforts to consolidate the markets are unfair conduct under Cal. Bus. & Prof. Code § 17200 because its conduct threatens an incipient violation of antitrust laws, violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

456.    Ribbon's false advertising includes the material and false statements to Metaswitch's customers that have misled or are likely to mislead Metaswitch's customers and prospective customers about the sustainability of Metaswitch's business, and the false statements of patent infringement against Metaswitch.   This false advertising campaign was and is undertaken in both objective and subjective bad faith, as set forth in further detail above.   Ribbon's conduct was immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers, and members of the public are likely to be deceived.

457.    As a direct, proximate, and foreseeable result of Ribbon's wrongful conduct, Metaswitch has suffered harm in California.   Metaswitch has suffered an economic injury in fact, including the loss of money from lost sales, revenue, and market share, increased costs, and unnecessary litigation expenses as a result of Ribbon's unfair business acts and practices constituting unfair competition.

458.    Such harm includes, but is not limited to, the expenditure of Metaswitch employee time and resources in California, including Metaswitch employees operating out of Metaswitch Network Corp.'s United States offices in Los Altos and Alameda and Metaswitch Network Corp.'s former office in San Francisco, and including, but not limited to, the time and resources of Metaswitch management residing and working in California.   Such harm also includes the expenditure of other employee time and resources within the state of California, regardless of where those employees reside or work, including the time and resources of other Metaswitch management.

459.    Ribbon committed the specific acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Metaswitch in California and other markets, and acted with an improper motive amounting to malice and in conscious disregard of Metaswitch's rights.

## COUNT XI

### Declaratory Judgment
### 28 U.S.C. § 2201

460.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 459 as if fully set forth herein.

461.    Pursuant to 28 U.S.C. § 2201, Metaswitch seeks a declaration that:

   a.  Ribbon has monopolized, or in the alternative, attempted to monopolize, the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

   b.  Ribbon has unlawfully leveraged its monopoly power in the Legacy DMS Maintenance Market to monopolize the Fixed-Line Network Transformation Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

   c.  Ribbon has engaged in coercive pricing conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

   d.  Metaswitch has a royalty-free license to U.S. Patent Nos. 6,772,210 ("Method and Apparatus for Exchanging Communications Between Telephone Number Based Devices in an Internet Protocol Environment"), 6,791,971 ("Method and Apparatus for Providing a Communications Service, for Communication and for Extending Packet Network Functionality"), 7,047,561 ("Firewall for Real-Time Internet Applications"), 6,934,279 and 7,995,589 ("Controlling Voice Communications over a Data Network"), and 8,600,006 ("Voice Continuity Among User Terminals") (collectively, the "CableLabs Patents"), pursuant to the royalty-free licensing provision under Nortel Networks Cable Solutions, Inc.'s and Ribbon's agreements with CableLabs, and Ribbon may no longer assert such patents against Metaswitch;

   e.  Metaswitch is allowed to perform standard maintenance work on legacy DMS switches without infringing any intellectual property of Ribbon, and Ribbon cannot assert otherwise to Metaswitch's customers and potential customers;

   f.  Metaswitch can make line frame adapters without infringing any intellectual property of Ribbon, and Ribbon cannot assert otherwise to Metaswitch's customers and potential customers;

   g.  Ribbon has engaged in false and/or misleading advertising and promotional activity in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

   h.  Ribbon has been unjustly enriched as a result of its unlawful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a trial by jury and hereby respectfully request:

A.      Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from Ribbon's violations of the Sherman Act;

B.      Pursuant to 28 U.S.C. § 2201, a declaration that Ribbon has monopolized, or in the alternative, attempted to monopolize, the Fixed-Line Network Transformation Market and the Legacy DMS Maintenance Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.      Pursuant to 28 U.S.C. § 2201, a declaration that Ribbon has unlawfully leveraged its monopoly power in the Legacy DMS Maintenance Market to monopolize the Fixed-Line Network Transformation Market, in violation of Section 2 of the Sherman Act;

D.      Pursuant to 28 U.S.C. § 2201, a declaration that Ribbon has engaged in coercive pricing conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

E.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Ribbon from asserting Nortel's CableLabs Patents—U.S. Patent Nos. 6,772,210 ("Method and Apparatus for Exchanging Communications Between Telephone Number Based Devices in an Internet Protocol Environment"), 6,791,971 ("Method and Apparatus for Providing a Communications Service, for Communication and for Extending Packet Network Functionality"), 7,047,561 ("Firewall for Real-Time Internet Applications"), 6,934,279 and 7,995,589 ("Controlling Voice Communications over a Data Network"), and 8,600,006 ("Voice Continuity Among User Terminals") (collectively, the "CableLabs Patents")—against Metaswitch;

F.      Pursuant to 28 U.S.C. § 2201, a declaration that Metaswitch has a royalty-free license to use the patents that Nortel and Ribbon contributed to and did not withdraw from the PacketCable standard.

G.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Ribbon from continuing the unlawful acts in violation of Sections 1 and 2 of the Sherman Act;

H.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Ribbon from offering discounts to customers on the condition that the customers do not purchase products or services from Metaswitch.

I.      Pursuant to 28 U.S.C. § 2201, a declaration that Metaswitch is allowed to perform standard maintenance work on legacy DMS switches without violating Ribbon's intellectual property rights, and Ribbon cannot assert otherwise to Metaswitch's customers and potential customers;

J.      Pursuant to 28 U.S.C. § 2201, a declaration that Metaswitch can make line frame adapters without violating Ribbon's intellectual property rights, and Ribbon cannot assert otherwise to Metaswitch's customers and potential customers;

K.      Pursuant to 28 U.S.C. § 2201, a declaration that Ribbon has engaged in false and/or misleading advertising and promotional activity in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

L.      Pursuant to 15 U.S.C. §§ 1116–17, permanent injunctive relief preventing and restraining Ribbon from continuing its unlawful acts in violation of the Lanham Act, 15 U.S.C. § 1125(a), recovery of Ribbon's profits and Metaswitch's trebled damages resulting from Ribbon's violations of the Lanham Act, recovery of the costs of this action, and attorneys' fees;

M.      Pursuant to N.Y. Gen. Bus. Law §§ 349–50, permanent injunctive relief preventing and restraining Ribbon from continuing its unlawful acts, recovery of Metaswitch's damages resulting from Ribbon's violations of law, and recovery of attorneys' fees;

N.      Pursuant to N.Y. Gen. Bus. Law § 340(5), trebled damages resulting from Ribbon's violations of the Donnelly Act and permanent injunctive relief preventing Ribbon from continuing the unlawful acts in violation of the Donnelly Act;

O.      Pursuant to 28 U.S.C. § 26, such other permanent injunctive relief as the Court finds necessary to restore competition in the relevant markets or based upon this Court's declaratory judgments;

P.      Pre-judgment and post-judgment interest at the maximum legal rate;

Q.      Metaswitch's costs, expenses, and reasonable attorneys' fees in bringing this action; and

R.      Such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated:  November 19, 2018

WINSTON & STRAWN LLP

Jeffrey L. Kessler
Susannah P. Torpey
Mulan Cui, *pro hac vice forthcoming*
Brett M. Waters, *pro hac vice forthcoming*
200 Park Avenue
New York, NY 10166
(212) 294-6700
jkessler@winston.com
storpey@winston.com
mcui@winston.com
bwaters@winston.com

Thomas M. Melsheimer, *pro hac vice*
   *forthcoming*
2121 North Pearl Street
Dallas, TX 75201
(214) 453-6500
tmelsheimer@winston.com

*Attorneys for Plaintiffs*
*Metaswitch Networks Ltd. and*
*Metaswitch Networks Corp.*

114